# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| Hutchinson Technology Inc., | Case No. 21-cv-02618 (SRN/DJM) |
| Plaintiff, | |
| v. | |
| Suncall Corp., | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Alan G. Carlson, Erik G. Swenson, Mitchell R. Williams, and Tara C. Norgard, Carlson Caspers Vandenburgh Lindquist & Schuman PA, 225 S 6th Street, Suite 4200, Minneapolis, MN 55402, for Plaintiff

Abigail Teresa Reardon, Erik R. Fuehrer, Erin Larson, Jon Ikegami, Mary Catherine Dahl, Michael L. Burns IV (pro hac vice), Nathan Carpenter (pro hac vice), Robert Buergi (pro hac vice), Sangwon Sung (pro hac vice), and Soumitra Deka (pro hac vice), DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020, for Plaintiff

Faris Rashid, Jeanette M. Bazis, and Jeya Paul, Greene Espel PLLP, 222 S. Ninth Street, Suite 2200, Minneapolis, MN 55402, for Defendant

Benjamin J. Bradford (pro hac vice), Erica Sedler (pro hac vice), Kaiwen Luan (pro hac vice), Mitchell Denti (pro hac vice), Miwa Shoda (pro hac vice), Nick G. Saros (pro hac vice), Nicole Keenan (pro hac vice), and Paaras Modi (pro hac vice), Jenner & Block, 353 N. Clark St Chicago, IL 60654-3456, for Defendant

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter is before the Court for claim construction of terms identified in the parties' Joint Status Report Regarding Claim Construction [Doc. No. 60] and supporting

briefs: Defendant's Opening Claim Construction Brief [Doc. No. 88] ("Suncall Br."), Plaintiff's Opening Claim Construction Brief [Doc. No. 93] ("HTI Br."), and Defendant's Responsive Brief [Doc. No. 133] ("Suncall Reply Br.").

## II.    BACKGROUND

Plaintiff Hutchison Technology, Inc. ("HTI"), a Minnesota-based corporation, and Defendant Suncall Corp. ("Suncall"), a Japanese corporation, both manufacture component parts for hard disc drives ("HDDs"). This patent infringement lawsuit concerns eleven United States Patents disputed by the parties, all having to do with design features of the components of the HDD.

HTI alleges that it is the owner of all rights in ten of the patents[1] and that Suncall has infringed its patents by "by making, using, offering to sell, and/or selling within the United States and/or importing into the United States certain suspension assemblies for hard disk drives (HDDs) that infringe the Asserted Patents, and/or Suncall's acts of actively inducing infringement or contributing to infringement of the Asserted Patents." (Compl. [Doc. No. 8] ¶ 4.) Suncall counterclaims, alleging that it is the owner of all rights in U.S. Patent No. 7,365,945 (the "'945 Patent"), and that HTI has infringed its patent by "making, using, offering to sell, and/or selling within the United States and/or importing into the United States certain magnetic head suspension assemblies that infringe the Suncall

---

[1] U.S. Patent Nos. 8,717,712 (the "'712 Patent"); 9,524,739 (the "'739 Patent"); 9,870,792 (the "'792 Patent"); 10,002,629 (the "'629 Patent"), 7,342,750 (the "'750 Patent"); 8,867,173 (the "'173 Patent"); 9,431,042 (the "'042 Patent") 9,245,555 (the "'555 Patent"); 8,498,082 (the "'082 Patent"); and 10,916,265 (the "'265 Patent").

Asserted Patents either directly or indirectly." (Answer and Countercl. [Doc. No. 47] at 20, ¶ 2.)

## A. Factual Background

An HDD is a computer component that can store a large amount of data. (HTI Tech. Tutorial [Doc. No. 146] at 2.) An HDD consists of circular discs (like CD-ROMs) on which data is stored, and an "actuator arm assembly," which is used to read data from and write data into the discs, also called "platters." (*Id*. at 3.)

All of the disputed patents have to do with the actuator arm, which contains a variety of different components from end to end. The "distal" end of the actuator arm is the end closer to the drive discs, while the "proximal" end is the end closer to the point of attachment with the structure of the disc drive. (*Id*. at 5.)

The actuator arm includes a "suspension assembly" at its distal end which supports a magnetic head that reads and writes data onto the discs. (*Id*.) An HDD's suspension assembly "precisely position[s] the recording head above the disc and provide[s] the electrical connection from the recording head to the disc drive's circuitry." (*Id*.) At issue in this case are various design features of suspension assemblies. (Compl. at ¶ 8.) The parties dispute the construction of certain claims in the eleven patents concerning design features relating to (1) the lift tab; (2) the dimple; (3) the traces; and (4) the actuators.

*Illustration 1* (HTI Tech. Tutorial at 6.)



### 1.    The Lift Tab Patent

An HDD's actuator arm moves back and forth between being "loaded" (positioned over the drive disc) and "unloaded" (not positioned over the disc). When the arm is in a loaded state, it sits above the discs and can read from and write data to the discs.  (HTI Tech. Tutorial at 9–10.)  When not reading or writing from the discs, the arm moves into an "unloaded" state, and rests on a ramp next to the discs.  (*Id*.)

*Illustration 2* (HTI Tech. Tutorial at 6.)



The lift tab, the component that actually contacts the ramp, is on the distal end of the actuator arm.  The lift tab consists of an engaging portion, which contacts the inclined face of the ramp to hold the actuator arm in place, and an inclined portion, which offsets the engaging portion away from the rest of the arm and the discs.  (*Id.*)  The lift tab is offset from and positioned above the rest of the actuator arm, but also sits in approximate parallel with the discs, so as not to touch and damage them. (*Id.* at 14.)

The '945 Patent[2] is the only patent at issue concerning the lift tab.  The Abstract of the '945 Patent describes the invention as follows:

> There is provided a magnetic head suspension including: a flexure portion which has a magnetic head mount area for supporting a magnetic head slider; a load bend portion which generates a load for pressing the magnetic head slider to a storage surface of a storage medium; a load beam portion which transmits the load to the magnetic head mount area; and a base portion which supports a base end region of the load bend portion. The load beam portion integrally includes a body in which at least a tip end portion thereof extends along a first plane approximately in parallel with the storage surface of the storage medium, and a lift tab extending forward from the tip end portion. The lift tab includes an engaging portion extending along a second plane which is approximately in parallel with the first plane and is positioned upper than the first plane so as to be spaced apart from the storage surface of the storage medium, and an inclined portion extending between the tip end portion of the body and the engaging portion. The load beam portion further includes a pair of flanges on both side edges in a width direction. The pair of side edges are positioned at least over the tip end portion and the inclined portion.

('945 Patent at 1.)  Figure 1 of the '945 Patent's specification (provided as Illustration 3 below) provides a schematic representation of a preferred embodiment of Suncall's model—Nos. 22a and 22b are the engaging portion and the inclined portion, respectively.

---

[2] *See* Suncall Index of Exhibits in Support of Claim Construction Br. [Doc. No. 89] ("Suncall Index"), Ex. 10.

*Illustration 3* ('945 Patent, Fig. 1, at 2.)



The '945 Patent is entitled "Magnetic Head Suspension With A Lift Tab." For purposes of this matter, the parties dispute the meaning of three separate terms found in claim 1, reproduced and highlighted below in relevant part:

1.    A magnetic head suspension with a lift tab, comprising:

  a) **…said lift tab includes an engaging portion extending along a second plane which is approximately in parallel with said first plane** and is positioned above the first plane so as to be spaced apart from the storage surface of said storage medium, and an inclined portion extending between the tip end portion of said body and said engaging portion[;]

  b) …**said pair of flanges extends only at an area substantially along the entire longitudinal extent of said body and the inclined portion**[; and]

  c) **said engaging portion is formed to have a curved cross section** so that a recess formed by said curved cross section faces upward[.]

('945 Patent at 7:11, 7:26–8:3; 8:6–12 (emphasis added to denote disputed terms).)

The claims of the '945 Patent aim to "improve the rigidity of the lift tab while effectively suppressing a mass increase to the lift tab." (HTI Tech. Tutorial at 12.)  As the actuator arm rests on the ramp, with the lift tab as the point of contact, the lift tab must be sufficiently rigid to pull up on the ramp when the actuator arm is in an unloading state. (*Id.*)  However, some obvious methods of adding rigidity—such as increasing the thickness or width of the lift tab—increase the mass of the lift tab, thus causing the "resonance characteristic and the shock resistance of the magnetic head suspension [to] deteriorate[,]" causing problems for the rest of the actuator arm.  (*See* '945 Patent 1:36–42.)

Relevant to the terms disputed by the parties, the '945 Patent includes three distinctive characteristics that are intended to increase rigidity while avoiding an increase in mass. First, the engaging portion or tip of the lift tab is elevated by the inclined portion, and sits above but approximately parallel (on a "second plane") to the body of the lift tab. (*See* '945 Patent 3:41–47.)  This helps ensure more separation between the engaging portion and the hard drive discs.

Second, the lift tab includes flanges extending along the tab's "approximately whole area in the longitudinal direction" of the body and inclined portions (but not the engaging portion). (*Id*. at 4:8–20.)  This design features adds rigidity to the assembly while adding less mass than thickening the entire engaging and inclined portions would add.

Third, the engaging portion of the lift tab is formed in a "recess-like configuration," *i.e.*, a curve.  (*Id*. at 3:51–55.)  This design feature improves rigidity without adding much mass.  (*Id*. at 3:62–65.)

### 2.    The Dimple Patents

The parties also dispute the interpretation of certain claim language in the '712 Patent; the '739 Patent; '792 Patent; and the '629 Patent (together, the "Dimple Patents")— patents held by HTI concerning the "dimple" component of the suspension assembly.[3]

All four of the Dimple Patents are titled "Disc Drive Suspension Assembly Having a Partially Flangeless Load Point Dimple," and share a common specification, which concerns a particular type of dimple called a "load point dimple."  (HTI Tech. Tutorial at 18.)   While in operation, the actuator arm moves in space, but the components that read and write data onto the HDD discs must remain level with the discs in order for the device to both read or write data and to avoid damaging contact between the actuator arm and the discs.

*Illustration 4* ('712 Patent. Fig. 4, at 5)



---

[3] *See* Suncall Index Ex. 3 (the '712 Patent), Ex. 4 (the '739 Patent), Ex. 5 (the '792 Patent) and Ex. 6 (the '629 Patent).

A load point dimple (Illustration 4 at #9) acts as a point of contact between the suspension assembly's load beam and the flexure below it, and is "configured to transfer a force to the flexure while allowing the flexure to move relative to the load beam." (*See*, *e.g.*, '712 Patent at 2:18–20.) This allows the flexure (Illustration 4 at #40) to remain roughly level in space with the load beam (Illustration 4 at #12) even as the latter moves.

However, the load point dimple takes up space on the load beam, where there is limited space. As such, the Dimple Patents aim to minimize the amount of space claimed by the dimple while retaining its purpose. The Abstract of the Dimple Patents' specification describes the invention as follows:

> Various embodiments concern a suspension assembly of a disk drive. The suspension assembly includes a load beam comprising a major planar area formed from a substrate. The load beam further comprises a window in the substrate, a dimple formed from the substrate, and a flange. The flange is a region of the major planar area that extends partially around the dimple but does not extend along an edge of the dimple. The edge of the dimple is adjacent to the window. The dimple is in contact with the flexure. A HAMR block or other element can extend through the window. **The lack of a full flange can minimize the necessary clearance between the dimple and the HAMR block or other element and thereby allow the window to be enlarged to accommodate the HAMR block or other element**.

('712 Patent at 1 (emphasis added).)

The Dimple Patents' specification makes 27 claims, of which three (claims 1, 16, and 27) are independent and the remaining 24 are dependent. For purposes of this matter, the parties dispute the meaning of two terms—"dimple" and "adjacent to [the

void/window/edge/flange]"—found in a variety of claims,[4] with the three independent

claims reproduced and highlighted below in relevant part:

> 1. A suspension assembly of a disk drive, the suspension assembly comprising:
>     a. a flexure;
>     b. and a load beam, the load beam formed from a substrate and comprising a major planar area, the load beam further comprising a void in the substrate, **a dimple** formed from the substrate, and a flange, wherein the flange is a region of the major planar area that extends partially around the dimple but does not extend along an edge of the dimple, **the edge of the dimple adjacent to the void**, and the dimple is in contact with the flexure and is configured to transfer a force to the flexure while allowing the flexure to move relative to the load beam. […]

> 16. A method of making a suspension assembly, the method comprising: forming a load beam from a substrate, the load beam comprising a major planar area; forming a void in the substrate; and forming **a dimple** in the substrate, the dimple formed to have a flange, the flange comprising a region of the major planar area that extends partially around the dimple but does not extend along an edge of the dimple, the dimple formed on the load beam such that the **edge of the dimple is adjacent to the void**. […]

> 27. A suspension assembly of a disk drive, the suspension assembly comprising: a flexure; and a load beam, the flexure mounted as a cantilever along the load beam, wherein one of the flexure or lead beam comprises a dimple, a flange that extends partially around the dimple but does not extend along an edge of the dimple, and a void in the one of the flexure or the lead beam that is **adjacent to the edge of the dimple**, and wherein the other of the one of the flexure or the load beam comprises a surface with which the dimple is engaged to transfer a force between the load beam and the flexure while allowing movement between the flexure and the load beam.

('712 Patent at 15:28–15:40; 16:14–25; 16:58–17:5.)

---

[4] '712 Patent, claims 1–4, 9, 13, 15–21, and 26–27; '739 Patent, claims 1–3, 7, 10, 12–14, and 18; '792 Patent, claims 1, 5, 8, 12, 15, and 19; and '629 Patent, claims 1, 4, 7, 10, 13, and 16.

*Illustration 5* (HTI Tech. Tutorial at 21)



The Dimple Patents propose changing the dimple's structure and position to expand the void or window in the flange and increasing the space available for other components. The proposed structural change involves truncating parts of the dimple, either the transition section or the peak of the dimple, which allows for a larger window or void.  (*Id.* 2:21–30).

If the suspension assembly can include more or larger components that perform functions within the HDD, such as the Heat-Assisted Magnetic Recording (HAMR) block mentioned in the patents' specification, the HDD can improve its performance.  (*See*, *e.g.*, '712 Patent 1:60–2:2; 2:31–35.)  As such components are often relatively large, increasing the available space on the flange is necessary to incorporate these components.  Truncating the dimple allows for a larger window or void, and thus creates the necessary space for components like an HAMR block.  By truncating but not removing the dimple entirely, the Dimple Patents expand the space available for these other components without simultaneously losing the functionality of a load point dimple in managing the flexure's movement in space.

### 3.   The Traces Patents

The parties dispute the interpretation of certain claim language in the '750 Patent; '173 Patent; and the '042 Patent (together, the "Traces Patents")—patents held by HTI concerning the suspension assembly's "traces."[5]  In the context of electronics components, "traces" are electrical tracks that allow a flow of current, functioning similarly to wires. (Suncall Tech. Tutorial at 9.)  In HDDs, traces are used to transmit the electrical signals that read data from and write data onto the discs in the drive.  (*Id*. at 11–12.)  Traces that read data from the discs are called "read traces," while traces that write data onto the discs are called "write traces."  (*Id*.)

The capability of a trace to store an electrical charge, and thus transmit electrical signals, is called "capacitance."  "Capacitive coupling" is a related concept, referring to the transfer of energy induced by an electrical field.  Here, it refers to how an electrical field generated by current traveling through the traces transfers energy to adjacent traces.  (HTI Tech. Tutorial at 26.)  The level of capacitive coupling is often higher between traces that are close together, and electrical signals may move faster through traces that are capacitively coupled to two neighboring traces as opposed to one.  (*Id*.)

Ensuring even capacitive coupling between the traces is important, as uneven electrical signals affect the accuracy of the data read from or written onto the discs in the drive. In particular, electrical signals going through one trace may interfere with adjacent

---

[5] *See* Suncall Index Ex. 1 (the '750 Patent), Ex. 7 (the '173 Patent), and Ex. 8 (the '042 Patent).

traces or other electrical components.  This interference disrupts the electrical signals sent

through the traces and creates undesirable "cross talk" between traces, which reduces the

accuracy of transmitted information.

### a.  The '173 Patent and '042 Patent

The '173 Patent and '042 Patent are titled "Balanced Multi-Trace Transmission in

a Hard Disc Drive Flexure."  The parties principally cite to the '173 Patent, as the two

patents share significant commonalities.  The Abstract of both the 173 Patent and '042

Patent's specification describes the invention as follows:

> Various embodiments concern a flexure comprising a base metal layer. The
> base metal layer can have a void between a first lateral side and a second
> lateral side. The flexure can further comprise a plurality of traces in an array.
> The plurality of traces can extend over the void and between the first and
> second lateral sides. The plurality of traces can comprise a pair of outer traces
> respectively located on lateral ends of the array and at least one inner trace
> between the pair of outer traces. The plurality of traces and the first and
> second lateral sides can be spaced relative to each other such that adjacent
> traces of the plurality of traces capacitively couple to each other and the pair
> of outer traces capacitively couple with each other through the first and
> second lateral sides.

('173 Patent at 1.)

The '173 Patent's specification makes 28 claims, of which three (claims 1, 14, and

22) are independent and the remaining 25 are dependent.  For purposes of this matter, the

parties dispute the meaning of three terms—"plurality of [coplanar] traces … in an array";

"the pair of outer traces are respectively spaced a second distance from the first and second

lateral edges"; and "capacitively couple"—found in various claims in both the '173 and '042 Patents.[6]

*Illustration 6* (HTI Tech. Tutorial at 25)



The '173 Patent and '042 Patent aim to address a common problem with how the traces on an HDD's suspension assembly work. For many HDDs, the physical placement and capacitive coupling of the traces is uneven because some traces are adjacent to and thus coupled with two other traces, while some traces are only coupled with one other trace. (HTI Tech. Tutorial at 26.)   Traces that are coupled with two other elements (or "double-coupled") have more capacitance than the single-coupled traces; this causes signals to move at different speeds and become asynchronous, which in turn interferes with the accurate transmission of data.  (*Id.*; '173 Patent at 2:63–3:6.)

The '173 and '042 Patents seek to address this issue through a design wherein each trace in an array of traces is always capacitively coupled to two other elements. (*See* HTI

---

[6] '173 Patent, claims 1, 3, 14, 21, 22, 24, and 28; and '042 Patent, claim 1.

Tech. Tutorial at 25, Fig. 4.)  Traces are either connected to an adjacent trace or by a connection through the lateral side of a base metal layer of the flexure.  ('173 Patent 3:50–62).  In Illustration 6 above, #12 and #13 represent traces that are capacitively coupled to two adjacent traces, while #11 and #14 represent traces that are capacitively coupled to one adjacent trace and also to each other through the base metal layer.  By changing the distribution of traces and balancing the connections between them, the problem of uneven coupling and thus interference is alleviated.  (*Id.*)

### b. The '750 Patent

The '750 Patent is titled "Method for Providing Electrical Crossover in a Laminated Structure," and concerns a different technological development—the use of conductive "islands" to prevent "cross-talk" between traces—to address a related problem as the one addressed by the '173 Patent and '042 Patent.  The Abstract of the '750 Patent's specification describes the invention as follows:

> An externally wireless laminated suspension for a hard disk drive are disclosed. In one embodiment, the externally wireless laminated suspension has an insulating layer to electrically isolate a first and second electrical trace from a conductive support layer. The second electrical trace crosses over the first electrical trace. The first electrical trace may be made of a first part on one side of the second electrical trace and a second part on the opposite side of the electrical trace. A conductive island area may be patterned into the support layer. The conductive island area may electrically couple the first part of the first electrical trace to the second part. The number of crossover points that the first electrical trace has may equal the number of crossover points that the second electrical trace has.

('750 Patent at 1.)

The '750 Patent's specification makes 22 claims, of which two (claims 1 and 12) are independent and the remaining 20 are dependent.   For purposes of this matter, the

parties dispute the meaning of the phrase "non-continuous first trace" found in claims 1–2, 4, 10–13, and 21–22.  The relevant claim language is reproduced and highlighted below:

> 1.  A laminated suspension, comprising:
>     a.  a support layer;
>     b.  a **non-continuous first trace** electrically connecting a slider to a pre-amplifier;
>     c.  a second trace electrically connecting the slider to the pre-amplifier, the second trace to cross over the **noncontinuous first trace** at a first trace crossover point, and to remain electrically isolated from the non-continuous first trace; and
>     d.  an insulating layer isolating the **non-continuous first trace** and the second trace from the first support layer.

('750 Patent 5:5–15) (emphasis added).

The '750 Patent aims to address the issue of cross-talk.  When a suspension has parallel traces, electrical signals going through one trace may interfere with adjacent traces, disrupting the electrical signals sent through the traces and creates undesirable cross-talk between traces.  (HTI Tech. Tutorial at 28.)   In particular, when the same head is used to both read and write data, "the read trace may sense the write current going through the adjacent write trace. The write current may then produce current through the read head through induction, creating cross talk. Cross talk may degrade the reliability of the read head." ('750 Patent 3:1–5.)

In order to address this issue, the '750 Patent proposes using crossover points (*see* Illustration 7, *infra*) in a layered structure.  Rather than directly linking or crossing over traces, traces that are not physically continuous are instead linked through a "conductive island area." (*Id*. at 29–30.)  This design thus mitigates cross-talk between adjacent traces.

16

*Illustration 7* (HTI Tech. Tutorial at 30.)



### 4. The Actuator Patents

The parties dispute the interpretation of certain claim language in the '555 Patent and the '082 Patent (together, the "Actuator Patents").[7] Each of the Actuator Patents concerns a different aspect of how microactuators are incorporated into the suspension assembly.

In order for an HDD to accurately read from and write data to the hard discs, its reading and writing head (at the distal end of the actuator arm) must be properly positioned over the correct disc. (HTI Tech. Tutorial at 33.) Microactuators are tiny motors that perform the fine-tune movements necessary to ensure that the tip of the suspension is over the proper track on the disc. (*Id.*)

---

[7] *See* Suncall Index Ex. 9 (the '555 Patent) and Ex. 2 (the '082 Patent).

*Illustration 8* (HTI Tech. Tutorial at 32.)



The designs in the Actuator Patents concern dual-stage actuated (DSA) suspension or triple-stage actuated (TSA) suspension, referring to the number of microactuators in the assembly, although the patent specifications at issue here deal with DSA suspensions.  (*Id.* at 32.)  A DSA suspension is an evolution of a single-stage actuated suspension, and includes both the motor of the single-stage actuated suspension and additional microactuators for finer-tune movement control.  (*Id.*)

### a.  The '555 Patent

The '555 Patent is titled "Low Resistance Ground Joints for Dual Stage Actuation Disc Drive Suspensions," and deals with the design of the connections between microactuators and the base plate of the flexure.  The Abstract of the '555 Patent's specification describes the invention as follows:

> Stable, low resistance conductive adhesive ground connections between motor contacts and a gold-plated contact area on a stainless steel component of a dual stage actuated suspension. The stainless steel component can be a baseplate, load beam, hinge, motor plate, add-on feature or flexure.

('555 Patent at 1.)

The '555 Patent's specification makes 20 claims, of which two (claims 1 and 13) are independent and the remaining 20 are dependent. Here, the parties dispute the meaning of the phrase "through hole in the flexure," found in relevant part in the language of claims 1 and 13, reproduced and highlighted below in relevant part:

1. A dual stage actuation suspension, including:
   a. a flexure, the flexure having a stainless steel base layer, a trace layer, a through hole, and a plated contact, the plated contact comprising a non-corrosive metal or metal alloy plated on the trace layer, the plated contact exposed through the **through hole in the flexure**;
   b. a motor having an electrical contact; and
   c. a conductive adhesive joint extending from the electrical contact to the plated contact to electrically connect the electrical contact with the trace layer. […]

12. A dual stage actuation suspension, including

   a. a flexure, the flexure having a stainless steel base layer, a trace layer, a through hole, and a plated contact, the plated contact comprising a non-corrosive metal or metal alloy plated on the trace layer, the plated contact exposed through the **through hole in the flexure**;
   b. a motor having an electrical contact; and
   c. a conductive adhesive joint, the conductive adhesive extending from the electrical contact, over an edge of the motor, through the opening, and into contact with the plated contact to electrically connect the electrical contact with the trace layer.

('555 Patent 6:8–17, 49–60) (emphasis added).

The '555 Patent's invention aims to improve the functioning of the microactuators by improving their electrical connection to the base plate of the flexure. Microactuators are electrically connected via a "joint" to the base plate with conductive adhesive and require a baseline level of electrical resistance in order to function under "all applied processing and operational load conditions." (HTI Tech. Tutorial at 38; *see also* '555

19

Patent 3:10–14.)   Consistently maintaining an acceptable level of resistance is often difficult, as the resistance required is frequently both high and unstable.   (*Id.*)   This is especially true for conductive adhesive-to-stainless steel component joints.   (*Id.*)

*Illustration 9* (HTI Tech. Tutorial at 39.)



To address this problem, the '555 Patent proposes making a hole in the stainless steel of the base plate and connecting the microactuator to a plated trace with conductive adhesive.   This creates a more stable and low-resistance connection between the base plate and the microactuator that still meets the levels of resistance required for the microactuator to function properly.   ('555 Patent 2:22–29.)

### b.  The '082 Patent

The '082 Patent is titled "DSA Suspension with Improved Actuator Stroke Length." It deals with the use of adhesives—conductive and non-conductive—to connect microactuators to the base plate. The Abstract of the '082 Patent's specification describes the invention as follows:

20

In a dual stage actuated (DSA) suspension, a PZT microactuator is electrically and mechanically bonded to the rest of the suspension by non-conductive epoxy on the front and rear bottom faces of the PZT, by conductive epoxy that bridges a gap between the top face of the PZT which defines the ground electrode and an adjacent metallic and grounded portion of the suspension, and further by additional non-conductive epoxy that bridges the gap and which at least partly overlies the conductive epoxy. The additional non-conductive epoxy increases the effective stroke length of the PZT.

('082 Patent at 1.)

The parties dispute the meaning of the phrases "conductive polymer extending between a first and generally horizontal surface of the microactuator and a grounded flat surface on at least one of said portions" and "separated by a horizontal gap[,]" which appear in claim 11 of the '082 Patent's specification, reproduced and highlighted in relevant part below:

11.    A dual stage actuated (DSA) suspension for a disk drive, the suspension comprising:

    a.  a flexure, a proximal portion attached to an actuator arm;
    b.  a distal portion to which a head slider is mounted;
    c.  a microactuator disposed on said suspension and mounted between the proximal portion and the distal portion of the suspension and affixed to each of said portions;
    d.  a conductive ground path comprising **conductive polymer extending between a first and generally horizontal surface of the microactuator and a grounded flat surface on at least one of said portions**, the first surface of the microactuator and the grounded flat surface of the suspension **being separated by a horizontal gap**;
    e.  a non-conductive polymer disposed on said first surface of the microactuator and extending across the gap and onto and over the grounded flat surface of the suspension and bonded directly to said grounded flat surface of the suspension.

('555 Patent 8:19–36.)

Linear expansion or contraction—*i.e.*, movement—of the part of the suspension moved by the actuator, which occurs whenever the HDD performs tasks such as reading information from or writing information onto the discs, is called "stroke." ('082 Patent 2:3–7.) However, microactuators are anchored to the base plate with adhesive, and these adhesives deform through use. This deformation limits stroke length, making the job of the microactuators—precisely positioning the head slider over the correct track on a disc—more difficult. (HTI Tech. Tutorial at 33.)

*Illustration 10* (HTI Tech. Tutorial at 36.)



The '082 Patent solves this problem by applying additional adhesive to anchor the microactuators in place. (*See* '082 Patent 2:10–19.)

### B. Procedural History

HTI filed this suit on December 7, 2021, asserting that Suncall had infringed a total of 16 patents. (See Compl. ¶ 3.) Suncall filed its answer on April 27, 2022 (Doc. No. 30) and filed an amended answer and counterclaims as to two patents on September 1, 2022. (Answer and Countercl. at 19, ¶ 1.) HTI filed its reply to Suncall's counterclaims on September 22, 2022, and made its own counterclaim as to two patents. (HTI Reply to Countercl. [Doc. No. 48].) Suncall filed its reply to HTI's counterclaim on October 13, 2022. (Suncall Reply to Countercl. [Doc. No. 51].)

22

On April 27, 2023, the parties filed a joint claim construction statement.  [Doc. No. 60.]  On May 23, 2023, the parties stipulated to withdraw all claims and counterclaims as to two patents.  (Doc. No. 64.)   On August 11, 2023, the parties stipulated to withdraw all claims and counterclaims as to five additional patents.  (Doc. No. 82.)   On October 18, 2023, the Court held a Markman claim construction hearing.  (*See* Markman Hearing Trans. [Doc. No. 159].)

## III.    DISCUSSION

### A.  Legal Standard

Patent claim construction, *i.e.*, the interpretation of the patent claims that define the scope of the patent, is a matter of law exclusively for the court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  Proper claim construction requires an examination of the intrinsic evidence of record, including the claim language, the specification, and the prosecution history.  *Computer Docking Corp. v. Dell, Inc.*, 519 F.3d 1366, 1373 (Fed. Cir. 2008) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed Cir. 1996)).  In all instances, however, the court must begin with the words of the claims themselves, which are "of primary importance, in the effort to ascertain precisely what it is that is patented."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (quoting *Merrill v. Yeomans*, 94 U.S. 568, 570 (1876*)); see also Clare v. Chrysler Group LLC*, 819 F.3d 1323, 1327 (Fed. Cir. 2016) ("The language of the claims determines what the patentee regards as the invention and defines what the patentee is entitled to exclude.") (citation omitted).

The words of a claim generally carry "the [ordinary and customary] meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313. The ordinary meaning can only be disregarded "when a patentee sets out a definition and acts as his own lexicographer [or] when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Vitronics Corp.*, 90 F.3d at 1580). To act as a lexicographer, the patentee must "clearly set forth a definition of the disputed claim term in either the specification or prosecution history." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).

Several resources exist to aid the court in understanding how such a person would understand the scope of a claim term. "To begin with, the context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. Likewise, other claims of the patent in question can be "valuable sources of enlightenment as to the meaning of a claim term." *Id.* (citing *Vitronics*, 90 F.3d at 1582). "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314–15.

Because the claims do not stand alone, however, but are part of "a fully integrated written instrument," *Markman*, 52 F.3d at 978, they must also be read in view of the specification—"the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582). Thus, the specification may reveal a

special definition given to a claim term by the patentee, or disclose an intentional disclaimer of claim scope. *Id.* at 1317.

However, the Federal Circuit has frequently admonished lower courts to avoid the temptation of importing a limitation from the specification into the claim itself. *See CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005) ("In examining the specification for proper context, however, this court will not at any time import limitations from the specification into the claims.") (citation omitted). Importing limitations into the patent's terms from the specification is one of the "cardinal sins of patent law[.]" *Phillips*, 415 F.3d at 1319–20. In particular, a description of a preferred embodiment contained within the specification does not—by itself—indicate intent to confine the claims to that embodiment. *See*, *e.g.*, *Inline Plastics Corp. v. EasyPak, LLC*, 799 F.3d 1364, 1369 (Fed. Cir. 2015) (quoting *Phillips*, 415 F.3d at 1323).

Beyond the specification itself, the Court should also consider the patent's prosecution history. *Markman*, 52 F.3d at 980. Like the specification, the prosecution provides valuable evidence of how the Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. In order for statements made during a prosecution to disavow claim scope, the statements must be "both clear and unmistakable," a "demanding standard." *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016). "Where the alleged disavowal is ambiguous, or even 'amenable to multiple reasonable interpretations,'" there is no disclaimer. *Id.* (quoting *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1359 (Fed. Cir. 2003)).

Although the Court may, in its discretion, consider extrinsic evidence as an aid in determining proper claim construction, it is improper to do so if intrinsic evidence alone will otherwise resolve any ambiguity in the disputed term. *See Vitronics*, 90 F.3d at 1583. The Court may, however, use a dictionary or technical treatise to "assist in understanding the commonly understood meaning" of a term, so long as any meaning found in such sources does not contradict the definition that is found in the patent documents. *Phillips*, 415 F.3d at 1322–23.

Finally, a court need not construe every term for no other reason than because one party or another requests that it do so. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *see also Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (noting that claim construction "is not an obligatory exercise in redundancy"). A term that is clear and readily comprehensible in its original form may need no further elucidation. *See Ecolab USA v. Diversey, Inc.*, No. 12-cv-1984 (SRN/JJG), 2015 WL 258570, at *14 (D. Minn. Jan. 23, 2014) (declining to construe term that was "already understandable"); *see also Phillips*, 415 F.3dd at 1314 (observing that the proper construction of a term may at times be apparent even to laypersons); *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) (holding that claims at issue did "not require elaborate interpretation"). However, "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro*, 521 F.3d at 1362.

**B. Claim Construction For The Lift Tab Patent**

The parties dispute the meaning of three phrases from claim 1 of the '945 Patent: (1) "said lift tab including an engaging portion extending along a second plane which is approximately in parallel with said first plane"; (2) "an engaging portion extending along a second plane" and "said engaging portion is formed to have a curved cross-section"; and (3) "said pair of flanges extends only at an area substantially along the entire longitudinal extent of said body and the inclined portion." (Answer and Countercl. ¶¶ 11–26.) Suncall defends all three phrases as requiring no special construction, while HTI argues that all three are fatally indefinite.

For a patent claim to be definite, it must, "read in light of the specification delineating the patent, and the prosecution history . . . inform, with reasonable certainty, [a person of skill] in the art [also known as a "POSITA"] about the scope of the invention." *See Nautilus, Inc. v. Biosig Instruments*, Inc., 572 U.S. 898, 901 (2014). "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). The Federal Circuit has provided that "the dispositive question in an indefiniteness inquiry is whether the 'claims,' not particular claim terms" fail this test. *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1231 (Fed. Cir. 2016). For that reason, while a single indefinite claim term can render the claim indefinite, a claim term that "does not discernably alter the scope of the claims" may fail to serve as a source of indefiniteness. *Id*.

The Court finds that none of the three phrases provide a POSITA with sufficient guidance to understand the scope of the patent claim, and are thus indefinite.

27

**1. "[S]aid lift tab including an engaging portion extending along a second plane which is approximately in parallel with said first plane"**

| HTI's Proposed Construction | Suncall's Proposed Construction | Court's Construction |
|---|---|---|
| Indefinite. | No construction necessary. | Indefinite. |

Suncall argues that this term of the patent does not need construction because numerical precision is not required for a POSITA to have reasonable certainly about the scope of the patent, interpreted in light of the claims and specification. In the instant case, because two planes (or two manufactured components) cannot mathematically, let alone realistically, be *precisely* in parallel, stating that they must be *approximately* in parallel is sufficiently specific to sustain the patent. (Suncall Br. at 41–42.) According to Suncall's expert, Dr. William Messner, a POSITA would understand from the context and purpose of the invention that "approximately in parallel" means that planes are parallel—or nearly parallel—to account for minor differences between designs and inevitable variances in manufacturing. (Messner Decl. [Doc. No. 90] ¶¶ 65–72.) Moreover, "approximately in parallel" permits "a single value to specify the offset between the two planes." (Suncall Br. at 41, citing Messner Decl., ¶¶ 68–69).[8]

HTI argues that the patent is indefinite because the phrase "approximately in parallel" is a term of degree for how close to parallel the two planes must be, terms of degree require objective boundaries, and such objective boundaries are not provided by the terms of the patent. (HTI Br. at 23.) HTI argues that while numerically precisely parallel

---

[8] In the patent specification, this offset value is cited as Value H1 of Figure 3B ('945 Patent at 4, Fig. 3B).

planes are not required, some objective measure of what "approximately in parallel" means—such as a range of degrees of acceptable deviation or a more specific definition provided by the specification—is necessary but not provided by Suncall. (*Id.* at 24, 27–29.) HTI also argues that Dr. Messner concedes that there are not clear objective boundaries, and each of Dr. Messner's attempted clarifications fails to provide an objective boundary to "approximately." (*Id.* at 24–29.)

Terms which define the claim in relation to a reference point are terms of degree. *See Seattle Box Co. v. Indus. Crating & Packing*, 731 F.2d 818, 826 (Fed. Cir. 1984) ("substantially equal to" is a term of degree); *HZNP Medicines LLC v. Actavis Laboratories UT, Inc.*, 940 F.3d 680, 692 (Fed. Cir. 2019) ("consisting essentially of" is a term of degree); *Hay & Forage Industries v. New Holland North America, Inc.*, 25 F.Supp.2d 1180, 1186 (D. Kan. 1998) ("at least approximately equidistant" is a term of degree). When a word of degree is used, the district court must determine whether the patent's specification provides some standard for measuring that degree. *See Seattle Box Co.*, 731 F.2d at 826. That standard must provide "objective boundaries for those of skill in the art" to measure that degree when "read in light of the specification and the prosecution history[.]" *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370–71 (Fed. Cir. 2014); *see also GE Lighting Sols., LLC v. Lights of Am., Inc.*, 663 F. App'x 938, 940 (Fed. Cir. 2016) (for a term of degree, "the patent must provide … objective boundaries"); *EcoServices, LLC v. Certified Aviation Servs., LLC*, 830 F. App'x 634, 649 (Fed. Cir. 2020) ("claims including a term of degree must provide objective boundaries for those of skill in the art").

29

HTI's argument that the claim is indefinite is persuasive. While Suncall's larger point—that completely parallel planes are impossible, and so "approximately in parallel" could theoretically provide for "minor design variations and manufacturing variances"— is reasonable, neither the language of the claim itself nor the specification provide any objective boundary for how large the variance from two precisely parallel planes may be before the planes are no longer approximately in parallel. Dr. Messner's testimony is illustrative of this problem, repeatedly relying on other terms of degree to define "approximately in parallel," such as "a few degrees" (Messner Decl. ¶ 67) or "significantly different" (*Id*. ¶ 69), rather than a definite measure.

Dr. Messner attempts to salvage the claim by focusing on the offset height, Value H1 described in Figure 3B of the specification. The offset height (the space between the plane of the load beam and the plane of the engaging portion) is 0.2 millimeters in the disclosed embodiment. (Messner Decl. ¶ 69.)

*Illustration 11* ('945 Patent at 4, Fig. 3B).



30

Dr. Messner argues that because the offset height does not differ "when measured from the base side of the engaging portion compared [to] the tip end of the engaging portion[,]" but would differ if the planes were not approximately parallel, a POSITA could understand that the planes are meant to be in parallel. (*Id.*) However, this argument does not resolve the '945 Patent's problem. As Suncall correctly notes, creating parallel planes is impossible. Regardless of a manufacturer's efforts, the offset height when measured from the base side of the engaging portion will always differ from the height when measured from the tip end of the engaging portion. Yet, there is nothing in the '945 Patent that provides objective boundaries on *how different* the offset heights can be—how far the planes can stray from being perfectly parallel—while still being "approximately parallel." Dr. Messner confirms that Value H1 does not provide sufficiently objective guidance when he concedes that two H1 values would always be needed to determine whether the planes are approximately in parallel. (*See* Buergi Decl. [Doc. No. 94], Ex. E ("Messner Dep.") at 126:22–130:16.) As such, Value H1 does not provide a POSITA with sufficient guidance to understand the scope of the patent claim.

Dr. Messner also argues that a POSITA would understand the scope of the invention because they understand the invention's purpose. (Messner Decl. ¶ 70) ("A person of skill in the art would understand that the transition between the inclined portion and the engaging portion should be designed to bring the engaging portion back into alignment (approximately in parallel) with the tip end portion of the load beam.") However, in deposition testimony, Dr. Messner could not define "a few degrees" except by reference to what would cause a "significant [] change in the intended function." (*See* Messner Dep. at

118:9–13.)  Such a "significant change" was not defined by "performance boundaries" contained within the patent specification, but rather by "engineers who design [the] disc drive [and the suspensions]."  (*Id*. at 119:9–120:25.)  Dr. Messner concedes that such "specified boundaries" differ from device to device.  (*Id*. at 131:8–132:5.)  This does not provide a POSITA with sufficient guidance to understand the scope of the patent claim.

The case law cited by Suncall is similarly unavailing.  In *Immersion Corp. v. Samsung Elecs. Am., Inc.*, No. 2:17-CV-572-JRG, 2018 WL 5005791, at *18–20 (E.D. Tex. Oct. 16, 2018), the court held that the phrase "approximately planar touch surface," used to describe the orientation of a touchpad for a portable computer, was not indefinite. However, key to this determination was that the specification disclosed features such as specific "lines, borders, distinct portions, and flexing" that would prevent the touchpad surface from being perfectly planar.  *Id*. at *18 (citing *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 786 F.3d 983, 1002–03 (Fed. Cir. 2015), which held that a patent for a screen using the phrase "substantially centered" was definite because it was centered except for a predefined amount of padding along the sides of the display.)  Such signposts for an objective boundary are not provided by the '945 Patent, its specification, or the prosecution history.  Similarly, in *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, No. 15 CIV. 10154 (PAE), 2018 WL 3773986, at *7–8 (S.D.N.Y. Aug. 9, 2018), the court held that the phrase "approximately horizontal component" was not indefinite because the specification and file history contained explanation or "clues" on the meaning of the term.  Conversely, the only clue gleaned by Suncall from the '945 Patent specification and file history is Value H1, which provides no objective boundary.

The phrase "approximately in parallel" in claim 1 of the '945 Patent is not clarified with objective boundaries. As such, the Court finds that this term of the '945 Patent is indefinite.

### 2. "[S]aid pair of flanges extends only at an area substantially along the entire longitudinal extent of said body and the inclined portion"

| HTI's Proposed Construction | Suncall's Proposed Construction | Court's Construction |
|---|---|---|
| Indefinite. | No construction necessary. | Indefinite. |

Suncall argues that this term of the patent does not need construction because the scope of the invention is clear from: (1) the patent specification; (2) the file history, wherein the Patent Office examiner added the challenged language and granted the patent; and (3) Dr. Messner's testimony. As to the patent specification, Suncall points to language that explains that the flanges extend "over at least the tip end portion and the inclined portion" of the body, as well as "across an approximately whole area" of the body and inclined portion of the load beam. (Suncall Br. at 47 (citing '945 Patent at 2:6–15).) As to the patent file history, Suncall argues that the PTO examiner's amendment of the claim to change the phrase "across an approximately whole area" to "substantially along the entire longitudinal extent of the body[,]" along with claim amendments made during prosecution in response to a prior art objection, supports its construction. (*Id*. at 47–48.) Dr. Messner's report and testimony elaborate on the evidence in the patent specification and file history. (*See* Messner Decl. ¶¶ 80–106.)

HTI argues that, as with "approximately in parallel," "substantially along" is a term of degree and therefore requires objective boundaries concerning its scope, which the '945

Patent does not provide as to what counts as "substantially along the entire longitudinal extent" of the body. (HTI Br. at 15.) It argues that, just as Dr. Messner could not define objective boundaries provided by the patent specification for "approximately in parallel," he also failed to do so here. (*Id.* at 17–18.) HTI also argues that the evidence in the patent specification and file history does not provide such objective boundaries. It argues that the phrase "over at least the tip end portion and the inclined portion" could include examples of flange lengths that are too short to be "substantially along" the body. Finally, it argues that the PTO's insertion of language into the claim should not be deferred to because it was issued prior to the *Nautilus* decision, that a phrase suggested by an examiner is not necessarily definite, and the differentiation of the '945 Patent from prior art also does not provide objective boundaries. (*Id.* at 19–22.)

HTI's argument that the term is indefinite is persuasive. The term is analyzed under the same legal standards as "approximately in parallel," discussed *supra*. Both parties have identified case law in which the term "substantially" was found to be either definite or indefinite; the Court's claim construction considered the term in the context of the intrinsic evidence. Similarly, while courts often grant deference to the PTO examiner in their determinations,[9] the fact that a PTO examiner suggested a term that is incorporated into

---

[9] The Federal Circuit has recently called into question its own practice of deference towards language inserted into patent claims by PTO examiners on the issue of definiteness. *See Nature Simulation Systems Inc. v. Autodesk, Inc.*, 23 F.4th 1334, 1343 (Fed. Cir. 2022) (holding that "[a]ctions by PTO examiners are entitled to appropriate deference as official agency actions, for the examiners are deemed to be experienced in the relevant technology as well as the statutory requirements for patentability. We presume that an examiner would not introduce an indefinite term into a claim when he/she chooses to amend the claim for the very purpose of putting the application in a condition for

the patent claim does not require the Court to treat the claim as definite.  *See*, *e.g.*, *Dura Glob. Techs., Inc. v. Magna Donnelly Corp.*, No. 2:07-cv-10945-SFC, 2010 WL 4259615, at *24–25 (E.D. Mich. Oct. 25, 2010); *Butamax Advanced Biofuels LLC v. Gevo, Inc.*, 117 F. Supp. 3d 632, 640–62 (D. Del. 2015).

As an initial matter, Dr. Messner conceded at his deposition that the '945 Patent does not provide explicit objective boundaries for what counts as "substantially" along the body of the load beam, either in the patent itself or its prosecution history.  (Messner Dep. 71:7–73:8.)  Suncall therefore argues that the '945 Patent provides "guidance," and implicitly provides objective boundaries through other phrases in the specification and the patent's prosecution history.

The '945 Patent's specification does not provide objective boundaries for the at-issue term.  While Suncall argues that "over at least the tip end portion and the inclined portion" provides an objective boundary, this argument is fatally undermined by Dr. Messner's deposition testimony.  At his deposition, Dr. Messner stated that the "body" discussed in the at-issue term "does not necessarily end where the flanges end."  (Messner Dep. 77:14–15.)  Dr. Messner further conceded that the claim does not "explicitly call[] out a boundary between the tip end portion and the rest [of the body of the load beam,]" and that different POSITAs "may or may not disagree" about the location of the proximal boundary—*i.e.*, the terminal point in the opposite direction of the engaging portion—of the tip end portion.  (Messner Dep. 107:9–109:4.)

---

allowance."), *modified and superseded on rehearing* 50 F.4th 1358 (removing any reference to deference to PTO examiners).

As Mr. Turner points out, depending on where the tip end portion's proximal boundary is located—*i.e.*, where the flanges terminate at the proximal end of the suspension assembly—the flanges could extend far less than "substantially along the entire longitudinal extent of said body" while still meeting the condition that they extend "over at least the tip end portion and the inclined portion." (Buergi Decl., Ex. A ("Turner Decl.") ¶ 106.) As Dr. Messner conceded, "if flanges extend along the inclined portion and the tip end portion, then [] that doesn't necessarily satisfy the 'substantially' limitation." Messner Dep. 112:2–8.) If the flanges can be "over at least the tip end portion and the inclined portion" without being "substantially along" the body of the load beam, the requirement that the flanges be "over at least the tip end portion and inclined portion" does not provide an objective boundary for the meaning of "substantially along the entire longitudinal extent of said body[.]"

The file history also does not provide objective boundaries for the at-issue term. During the patent prosecution, the PTO raised a prior art objection to Claims 1 through 12 of the '945 Patent as being anticipated by the Watanabe Patent.[10] (Suncall Index Ex. 29 at 10.) As to the flanges, in responding to the PTO examiner's objection, Suncall stated the following:

> The Watanabe patent appears to disclose a head suspension having a pair of ribs formed on both sides of back up plate and extend to corners formed at the tip of the back up plate. The Watanabe patent does not disclose a pair of

---

[10] *See* Buergi Decl. Ex. C, (Japanese Patent Application Publication No. 2001-143422 ("Watanabe Patent")); Ex. D (Watanabe Patent in English translation); and Suncall Index Ex. 29 (Oct. 19, 2007 applicant amendment) at 5–6. The Watanabe Patent refers to flanges as "ribs."

flanges that extend only at an area substantially along the entire longitudinal extent of said body and the inclined portion. Rather, the Watanabe patent appears to disclose that the ribs extend along the tip of the back up plate. A benefit of the claimed invention is that since the engaging portion does not have a flange, it is possible to independently adjust or set the dimension and surface roughness of the inclined portion with respect to a bending process for forming the flanges. There is no suggestion or rationale in the Watanabe patent to exclude ribs from the tip of the back up plate. Accordingly, the Watanabe patent fails to anticipate or render obvious the claimed invention.

(*Id.* at 11) (cleaned up.)  The '945 Patent was also amended in other ways as suggested by the PTO examiner and was later granted.  (*Id.* at 5–7.)

The prior art dispute concerning the Watanabe patent does not support Suncall's argument that the '945 Patent provides objective boundaries for the term "substantially along the entire longitudinal extent of said body[.]"  In differentiating the Watanabe Patent from the '945 Patent, Suncall did not point to the lack of flanges towards the proximal end of the Watanabe Patent's suspension assembly body (as depicted below).

*Illustration 12* (Watanabe Patent at Fig. 4)



Rather, Suncall argued that the patents were differentiated by the fact that in the '945 Patent's claimed invention, "the *engaging* portion does not have a flange." (Suncall Index Ex. 29 at 11) (emphasis added). The Watanabe Patent does not provide direct guidance as to how extensive the flanges must be towards the proximal end of the suspension assembly in order to extend "substantially along [its] entire longitudinal extent[,]" and cannot provide an objective boundary from which a POSITA could determine if the terms of the '945 Patent are met.

Dr. Messner's testimony concerning the Watanabe Patent does not rescue Suncall. Responding to HTI's question about whether the prosecution history of the '945 Patent provides objective boundaries for "substantially along," Dr. Messner said:

> The prosecution history does not provide [an objective boundary]. It provides guidance. Watanabe, not substantially. Okay. There we go. That's a lower bound. What's shown in the patent, that's, as far as I can tell, it's the entire. So substantially is something between 100 percent and whatever Watanabe shows. What's that exact number? There is no exact number. And the Patent Office issued this patent with that term of degree without a numerical value.

(Messner Dep. 73:4–22) (cleaned up). Later, Dr. Messner stated that his "best guess" for what percentage of the body was taken up by the flanges in the Watanabe Patent is "about 60 percent[.]" (*Id*. at 91:22–92:8.) Dr. Messner then conceded that flanges that extend along 60 percent of the body may not constitute flanges that are "substantially along the entire longitudinal extent" of the body, and that "how much more than 60 percent is 'substantially' depends [on the perspective of a POSITA, with] no definite number." (*Id*. at 92:19–93:18.) Dr. Messner never identified objective standards by which a POSITA could judge whether flanges are "substantially along the entire longitudinal extent of the

body," instead defining "substantially along" in terms of other words of degree not different than "substantially",[11] or by whether the resulting product works "well enough" that consumers would purchase it. (*See* Messner Dep. 85:7–87:20.) However, whether customers would purchase the product does not provide a usable metric because, as Mr. Turner testifies, flanges are not necessary for a functioning suspension assembly at all. (*See* Turner Decl. ¶ 108.) As such, the prosecution history also does not provide any objective boundaries.

Finally, Suncall, citing Mr. Turner's deposition testimony, suggests that data on load/unload performance or data on whether the suspension assembly is sufficiently rigid could provide a benchmark by which a POSITA could determine whether the flanges extend "substantially along the entire longitudinal extent of the body." (Suncall Reply Br. at 18–19 (citing Turner Dep. [Doc. No. 133, Ex. 1] at 159:18–160:3, 160:24–161:3).) This argument is unavailing. As Mr. Turner stated, "[y]ou could design a suspension such that you could achieve the same rigidity with various flange lengths if you varied other aspects of the design" such as making the structure thicker, changing the material used, or changing the length of different sections. (Turner Dep. At 163:15–164:18.) As with using the Watanabe Patent as a benchmark, if the body can reach an acceptable level of rigidity

---

[11] *See* Messner Dep. 67:19–68:10 (a "significant fraction," "as opposed to, say, insignificant"); 84:6–87:6 (performance does not change "very much;" it performs "well enough"); 89:16–90:5 ("something other than the entire amount"), 92:10–93:23 ("pretty much the whole way"); 100:9–22 ("approximately," "nearly so"); 100:23–101:19 ("it's near to," "it's almost," "it's approximately").

without flanges extending "substantially along" its length, then the level of rigidity cannot guide a POSITA in determining whether this criterion is met.

Similarly, load/unload performance data does not provide an objective boundary, as there is no clearly identified load/unload performance data provided in the '945 Patent specification or file history.  While Suncall argues that Figures 4A and 4B of the '945 Patent specification provide "data relevant to load/unload performance, such as plotted rigidity values," (Suncall Reply Br. at 19), Suncall has not provided the necessary expert foundation or explanation to treat these figures as a basis for a POSITA to determine an objective boundary.

Neither the '945 Patent's specification nor the file history relating to the Watanabe Patent provide objective boundaries to the phrase "substantially along the entire longitudinal extent of said body[,]" and Suncall does not identify an alternative source of objective boundaries.  As such, the Court finds that this term of the '945 Patent is indefinite.

### 3. "[S]aid pair of flanges extends only at an area substantially along the entire longitudinal extent of said body and the inclined portion"

| HTI's Proposed Construction | Suncall's Proposed Construction | Court's Construction |
|---|---|---|
| Indefinite. | No construction necessary. | Indefinite. |

Suncall argues that this term of the patent does not need construction because, as in its argument that the planes of the engaging portion and the load beam are "approximately in parallel," the engaging portion can have a curved cross-section and still be approximately in parallel with the load beam, much as a rolling pin can lie on a flat surface and be approximately in parallel with it.  (Suncall Br. at 43–44.)  HTI argues that the patent

is indefinite because the claim is nonsensical, as a curved object like the engaging portion cannot extend along a plane because a plane is definitionally flat while a curved object definitionally extends along a curved surface.  These terms therefore contradict each other and are impossible to reconcile, making the claim indefinite.  (HTI Br. at 6–9.)

As with insufficiently objective terms of degree, claims can be found indefinite if they are nonsensical.  *See Horizon Pharma, Inc. v. Dr. Reddy's Labs Inc.*, 839 F. App'x. 500, 505 (Fed. Cir. 2021); *see also Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1366–67 (Fed. Cir. 2016) (holding that claims "describing the extraction of machine code instructions from something that did not have machine code instructions" were "nonsensical in the way a claim to extracting orange juice from apples would be" and were thus indefinite).  "That the proper construction of the claims is nonsensical does not warrant judicial redrafting of the claims."  *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 799 n.6 (Fed. Cir. 1990).   However, while extrinsic evidence like dictionary definitions may be used, the "only meaning that matters in claim construction is the meaning in the context of the patent."  *Trs. of Columbia Univ.*, 811 F.3d at 1364.

HTI's argument that the claim is indefinite is persuasive.  A plane is defined as "a surface on which any two included points can be joined by a straight line lying wholly within the surface."  (Turner Decl. ¶ 61 (citing dictionary definition in Buergi Decl. Ex. B).)  Suncall does not provide an alternative plain-language or technical definition of a plane, nor does it identify an alternative definition of "plane" in the specification or prosecution history.  In his deposition, Dr. Messner defined a plane as "a geometric figure that is defined by two intersecting lines," with a plane being two-dimensional and a line

being one-dimensional.  (Messner Dep. at 142:24.)  The Court's analysis is the same under the two definitions.

As Dr. Messner provides, a shape or object "'[e]xtending along the plane' means a direction that is tangent to the hypothetical surface [of the plane.]  [T]o the extent that the shape [or object] has a well-defined tangent, then it would remain tangent to the plane." (Messner Dep. at 144:5–145:7) (cleaned up).  Dr. Messner conversely defines "extending along a line" to mean where "a shape for which a line [is] tangent, [i.e.,] just touches the shape in more than the single point, such as a cylinder resting on a table."  (*Id.* at 145:22–146:3) (cleaned up).  More succinctly put, "extending along a plane" requires that the shape or object extend along the plane in two dimensions, with a clear direction, while "extending along a line" requires only that the shape or object intersect with the plane as it extends along a single-dimensional line.  For the engaging portion of the assembly to "extend along" a second *plane*, the engaging portion has to lie on that plane, and in order for the engaging portion to lie on a plane, it has to be flat.  Otherwise, the engaging portion does not extend along the plane in two dimensions, even if it extends along a line intersecting with a plane in one dimension.

Suncall's arguments and Dr. Messner's opinion and testimony in essence argue that "plane" and "line" are interchangeable in the '945 Patent's claim, as they are used similarly in common parlance.  As Dr. Messner states:

> The use of the word "plane" in claim language, together with "extends forward," is for describing the direction in which the narrow feature points away from the rest of the structure. The word "plane" is not describing the shape of the feature. It is entirely sensible to describe a curved structure by the plane along which it extends, and the structure need not be flat to describe

its position relative to a plane. For example, a basketball rolls forward along the plane of a gym floor.

[…]

[N]ot only does the plain and ordinary meaning of this term suffice for a POSITA to understand what is claimed with reasonable certainty, but also that plain and ordinary meaning is further consistent with and supported by the specification and with both an everyday and a technical understanding of curved structures relative to planes.

(Messner Decl. ¶¶ 74, 78.)  Dr. Messner uses the same example for "extending along a line" as "extending along a plane" (a cylindrical object on a counter or tabletop), conflates "planes" and "lines," and states that, in the '945 Patent's Figure 3D (as annotated by Dr. Messner below), the "[curved cross-section] extends along a line in and out of the page." (Messner Dep. at 154:11–160:12.)

*Illustration 13* (945 Patent at 4, Fig. 3D)



Other than expert testimony implying that a POSITA would read these terms synonymously in the context of the patent claim—testimony that is contradicted by Mr. Turner (Turner Decl. ¶¶ 74–78) and undermined in Dr. Messner's deposition testimony— there is no evidence in the record supporting the inference that a POSITA would understand that "plane" is synonymous with "line" in the context of the '945 Patent.  The only guidance

for how "plane" should be defined is the dictionary definition provided by HTI, and from this definition, a curved object extending along a plane is a contradiction in terms.

The phrases "an engaging portion extending along a second plane" and "said engaging portion is formed to have a curved cross-section" are contradictory and taken together make Claim 1 of the '945 Patent nonsensical. As such, the Court finds that this term of the '945 Patent is indefinite.

### C. Claim Construction For The Dimple Patents

The parties dispute the meaning of the terms "dimple" and "adjacent to" the void, the edge, and/or the flange, as used in the Dimple Patents. Suncall argues that the term "dimple" should be construed as "a spherical protrusion providing a point about which a flexure can gimbal to allow pitch and roll relative to the load beam."[12] Similarly, "adjacent to" should be defined as "contacting [the void, the edge, and/or the flange]." (Suncall Br. 17–25.) HTI argues that neither term requires a special construction, but rather each should be given its plain and ordinary meaning. (HTI Br. 42–53.)

As discussed *supra*, the Court need not construe every term. *See O2 Micro Int'l Ltd.*, 521 F.3d at 1362; *see also Surgical Corp.*, 103 F.3d at 1568 (noting that claim

---

[12] At the parties' Markman hearing, Suncall's counsel retreated from defining a dimple as necessarily spherical or an indentation. (*See* Markman Hearing Trans. 119:4–16) ("You know, they nitpick about how our claim construction requires a spherical protrusion and they say the patent says it can being any shape. We're not wed to spherical. If the Court wants to just say a protrusion, that would be fine with us. Likewise, they take issue with the fact that the patent -- that a dimple can be either an indentation, or a depression, or some other effective synonym for protrusion. Again, we're not wed to the term "protrusion". If the Court wants, you know, to define it as a depression providing a point about which a flexure can gimbal to allow pitch and roll, we're fine with that as well.")

construction "is not an obligatory exercise in redundancy"). Non-technical claim terms do not necessarily require "elaborate interpretation." *See Brown*, 265 F.3d at 1352. Moreover, claim terms "are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312–13. Further, where "a claim uses clear structural language, it is generally improper to interpret it as having functional limitations." *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324 (Fed. Cir. 2002); *see also Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001) ("functions do not become part of [a] claimed structure unless claimed as such").

### 1. "Dimple"

| HTI's Proposed Construction | Suncall's Proposed Construction | Court's Construction |
|---|---|---|
| No construction necessary/plain and ordinary meaning | A spherical protrusion providing a point about which a flexure can gimbal to allow pitch and roll relative to the load beam | No construction necessary/plain and ordinary meaning. |

Suncall argues that "dimple" is "a term of art in HDD suspension technology because it has specific meaning and function to a POSITA," which is supported by (1) the specification of the '712 Patent; (2) other patents held by HTI; (3) technical articles concerning HDD suspension technology; and (4) Dr. Messner's opinion. (Suncall Br. at 17–20.) HTI argues that there is no need for a special definition of the word "dimple" specifically beyond its ordinary and customary meaning—a "depression in a surface"—as any narrower meaning is provided by the rest of the relevant patent claims, while Suncall's definition violates several canons of claim construction. (HTI Br. at 42–48.)

Suncall's proposed construction is unavailing. While Suncall's evidence certainly proves that, in the context of HDD technology, dimples are frequently used to "provid[e] a point about which a flexure can gimbal to allow pitch and roll relative to the load beam," including in the context of HTI's invention, none of Suncall's evidence defines a "dimple" as *necessarily* limited to this function, such that the word "dimple" should be defined narrowly by this function.

The specification of the '712 Patent describes how a dimple is used in the context of the patent but does not define the term in such a limited fashion. While a dimple's function here may be to provide a point about which the slider can gimbal, importing limitations from a specification is improper, and there is nothing in the patent claim that suggests that the function named in the specification becomes part of the dimple's structural definition. *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009). ("The claims, not specification embodiments, define the scope of patent protection. The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.")

The dimple is specifically described by the '712 Patent specification in the following passages:

> The flange is a region of the major planar area that extends partially around the dimple but does not extend along an edge of the dimple. The dimple and the void are positioned on the load beam such that the edge of the dimple is adjacent to the void and the dimple is in contact with the flexure and is configured to transfer a force to the flexure while allowing the flexure to move relative to the load beam. The dimple can comprise a spherical indentation and a transition section that is between the spherical indentation and the major planar area, the transition section at least partially surrounding the spherical indentation.

[. . .]

Either of the flexure or load beam comprises a dimple, a flange that extends partially so around the dimple but does not extend along an edge of the dimple, and a void that is adjacent to the edge of the dimple. The other of the flexure or the load beam comprises a surface with which the dimple is engaged to transfer a force between the load beam and the flexure while allowing movement between the flexure and the load beam.

[. . .]

The dimple provides a point about which the slider, attached to the flexure in a cantilevered manner, can gimbal in response to fluctuations in the air bearing to allow the slider to pitch and roll relative to the load beam.

('712 Patent 2:14–24, 2:48–55, 5:5–9.)  Nowhere is a "dimple" limited solely to Suncall's definition.  Rather, where a dimple's role is to act as a point on which other components can gimbal, the specification uses clear and detailed language.  Were a dimple necessarily defined as narrowly as Suncall's definition proposes, the surrounding description of the function the "dimple" performs in the context of the invention would be surplusage.

The absence or presence of specification language defining precisely how the dimple can function supports HTI's argument that, standing alone, the word "dimple" does not need a special construction for a POSITA to understand the scope of the invention. While Suncall argues that "HTI ignores the patents' titles, which state "Load Point Dimples," not just any dimple[,]" (Suncall Reply Br. at 7), this adds further support to HTI's argument.  That a dimple must be specified as a "load point dimple," rather than the word "dimple" alone providing sufficient guidance, favors construing the word "dimple" by its ordinary and customary meaning.

Neither the other HTI patents nor the technical articles cited by Suncall support its position.  While Suncall cites HTI's '241 patent and '487 patent (Suncall Index, Exs. 12

47

and 13, respectively) to define "dimple," the cited passages do not define "dimple" in the way Suncall seeks to construe the word in the '712 Patent. Similarly, while Suncall's cited technical articles concern load point dimples functioning in the manner described by Suncall's proposed definition, none define "dimple" by Suncall's definition nor limit all dimples to load-point dimples. In any case, the extrinsic evidence provided by HTI's other, unrelated patents and articles about HHDs is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317.

Further in the context of HDD technology, not all dimples necessarily constitute the kind of load-point dimple generally described by its proposed definition. During his deposition, Dr. Messner conceded that, in a separate matter, Western Digital—a major HDD manufacturer—used the term "side dimple" to refer to "roll-limiter" protrusions intended to "[prevent] excessive roll by the slider and slider gimbal assembly[.]" (*See* Messner Dep. 45:10–25.) The function of a "roll-limiter" or "side dimple" is different than a load point dimple, but both are referred to as "dimples." As such, while a "dimple" may often refer to a load point dimple, within the HDD manufacturing industry, a dimple may refer to more than one type of structure among HDD components, and the narrow construction proposed by Suncall would be improper.

The word "dimple" has an ordinary and customary meaning, and to the extent that meaning is limited within the context of the Dimple Patents, the other terms of the patent claims provide sufficient guidance to a POSITA without artificially narrowing the meaning of the word "dimple" itself. As such, the Court construes "dimple" by its ordinary and customary meaning.

## 2. "Adjacent to [the void, the edge, and/or the flange]"

| HTI's Proposed Construction | Suncall's Proposed Construction | Court's Construction |
|---|---|---|
| No construction necessary/plain and ordinary meaning | Contacting the void / the edge / the flange | "Next to" |

Suncall argues that the use of "adjacent to" to describe a dimple's position in comparison to the void, flange, or window should be construed as "contacting" the void, flange or window rather than in the same general vicinity as said structure because: (1) HTI's statements in the prosecution history differentiating its claims for the '739 Patent from prior art are consistent with this definition; and (2) Suncall's definition is consistent with HTI's use of the term "adjacent" in the patent specification. HTI argues that constructing "adjacent to" to mean "contacting" would violate several canons of claim construction and would therefore be incorrect.

The parties dispute the meaning of the prosecution history. Suncall argues that HTI differentiates the prior art "Yang Patent" (Suncall Index Ex. 25) by claiming that the Yang Patent lacked features including "having a protruding surface adjacent to the window[.]" (*See* Suncall Index Ex. 22 at 5.) HTI argues that the point of differentiation is not whether the dimple is "adjacent to" anything, but rather that the Yang Patent "does not have a truncated portion defining an edge of the window." (*Id*.)

HTI's characterization is more accurate. The relevant portion of the prosecution history reads:

The applicant respectfully disagrees with these rejections. However, by this response independent claims 28 and 47 are amended to more particularly point out and distinctly claim the applicant's invention, and to better distinguish the claimed invention from the prior art of record. In particular, claim 28 now recites, inter alia, a load beam comprising a planar area, a window in the planar area, and a dimple having a protruding surface adjacent to the window. The dimple has a truncated portion defining an edge of the window. Similarly, claim 47 recites, inter alia, a flexure or a load beam comprising a planar area, a window in the planar area, and a dimple having a protruding surface adjacent to the window and a truncated portion defining an edge of the window.

Neither the Yang publication nor the Tsuchiya patent teach or suggest a load beam or flexure having a window and dimple with these features. Fig. 2b of the Yang publication discloses a dimple surrounded by a planar surface of the load beam. **Unlike the suspension assembly recited by claims 28 and 47, the dimple shown in the Yang publication does not have a truncated portion defining an edge of the window.** Withdrawal of the § 102 and § 103 rejections is requested in view of these differences.

(*Id.*) (emphasis added).

While the paragraph mentions "these features," the only '739 Patent feature that is actually distinguished from the Yang Patent is the lack of a "truncated portion defining an edge of the window." As such, while not necessarily ruling out Suncall's proposed construction, the prosecution history does not support its construction to the extent that Suncall claims it does.[13]

---

[13] Suncall also argues that "HTI also took similar positions in this case when it tried to distinguish a prior art reference[,] Chocolaty '367[,]" from the '739 Patent. (Suncall Br. at 23.) As HTI notes, this claim—made in the context of this litigation rather than the long-since-completed patent prosecution—is not part of the file history and does not constitute intrinsic evidence. *See Beckson Marine, Inc. v. NFM, Inc.*, 292 F.3d 718, 726 (Fed. Cir. 2002) ("[L]itigation theories—to the extent not expressed in claim language, the patent specification, or the prosecution history—do not affect claim scope or bear on patent validity.")

The patent specifications also support HTI's position. The '712 Patent's first claim describes the structure of the claimed invention to include:

> a load beam, the load beam formed from a substrate and comprising a major planar area, the load beam further comprising a void in the substrate, a dimple formed from the substrate, and a flange, wherein the flange is a region of the major planar area that extends partially around the dimple but does not extend along an edge of the dimple, **the edge of the dimple adjacent to the void, and the dimple is in contact with the flexure** and is configured to transfer a force to the flexure while allowing the flexure to move relative to the load beam.

('712 Patent 15:31–40) (emphasis added).[14]

While not necessarily dispositive, "the use of both terms in close proximity in the same claim gives rise to an inference that a different meaning should be assigned to each." *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004) (citing *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996)). As the patent specification separately describes the dimple as "adjacent to" the void and as "contact[ing]" the flexure within the same sentence, the most logical inference to draw is that "contacting" and "adjacent to" describe different relationships between components.

Moreover, as HTI notes, the '712 Patent elsewhere describes the relationship of the trace assembly at the gimbal region as "adjacent to, and spaced apart from, the spring arms of the flexure." ('712 Patent 5:51–52.) If two components can be both "adjacent to" one

---

[14] The '739 Patent contains similar language. (*See* '739 Patent 15:47–50) ("A dimple having a protruding surface adjacent to the window, the dimple having a truncated portion defining an edge of the window, the dimple in contact with the flexure . . .") As such, the Court will apply the same analysis to the '739 Patent as the '712 Patent.

another and "spaced apart from" one another, then "adjacent to" cannot reasonably be read as synonymous with "contacting," as components logically cannot be both contacting one another and spaced apart from one another.

However, the definition of "adjacent" proposed by HTI's dictionary definitions— "next to or near"—is a term of degree, as "near" describes the position of an object only in relation to other objects and the scale used. *See*, *e.g.*, *Plastipak Packaging, Inc. v. Ice River Springs Water Co.*, Civil Action No. 19-cv-11193-IT, 2020 WL 6940709 at *3–4 (D. Mass. June 4, 2020) (treating "substantially adjacent" as a term of degree). While the parties have not briefed the question of whether a definition of "adjacent to" that includes "near" is sufficiently definite to provide a POSITA with an objective boundary, HTI provided that it is "amenable to a construction that is limited to 'next to.'" (HTI Br. at 49 n.4.) Limiting the construction of "adjacent to" to "next to" would ameliorate this potential issue.

As such, the Court construes "adjacent to" to mean "next to," as proposed by HTI.

### D. Claim Construction For The Traces Patents

The parties dispute the meaning of four terms from the Traces Patents. Suncall argues that: (1) the term "non-continuous first trace" from the '750 Patent should be construed as "[a] read trace without an uninterrupted physical path[;]" (2) the term "plurality of traces … in an array" / "plurality of coplanar traces …in an array" from the '173 Patent should be construed as "all traces of the flexure that overlap a window, where those traces overlapping the same window are grouped in an array[;]" (3) the term "the pair of outer traces are respectively spaced a second distance from the first and second lateral edges" from the '173 Patent should be construed as "the pair of outer traces overlapping a

window are spaced less than 50 micrometers from the first and second lateral edges[;]" and (4) the term "capacitively couple" from the '173 Patent should be treated as indefinite. (Suncall Br. at 5–11; 25–33.)   HTI argues that none of the terms requires a special construction, but rather each should be given its plain and ordinary meaning.  (HTI Br. 29–34; 53–61.)

### 1.  "non-continuous first trace"

| HTI's Proposed Construction | Suncall's Proposed Construction | Court's Construction |
|---|---|---|
| No construction necessary/plain and ordinary meaning. | A read trace without an uninterrupted physical path | No construction necessary/plain and ordinary meaning. |

The parties' dispute over this patent term is two-fold: (1) whether the "first trace" must be a read trace as opposed to either a read or write trace; and (2) whether a non-continuous first trace should be construed as not including an uninterrupted physical path. (*See* Suncall Br. at 5.)

### a.  First Trace

Suncall argues that the phrase "first trace" must be limited to read traces only, because the language of the patent claim states that the first trace "electrically connects the 'slider to the pre-amplifier'—not the preamplifier to the slider (a write trace), or a slider with the preamplifier."  (Suncall Br. at 5–6.)  Suncall also argues that the '750 Patent's specification only describes read traces as containing crossover points, and that the described purpose of the invention—to reduce signal bleed in read traces from adjacent write traces—concerns only read traces, rather than both types of traces.  (*Id*.)  HTI argues that Suncall overreads the word "to" and in so doing improperly redrafts the claim, imports

a limitation from the specification into the claim, and excludes embodiments where the trace at issue is a write trace.  (HTI Br. at 29–33.)

Suncall's construction is unavailing.  The use of the word "to" does not create an obvious inference of directionality; as argued by HTI, a computer may connect "to" the internet without implying that information only flows one way.  Moreover, in the text of the '750 Patent, the "first trace" is not the only trace referred to as connecting the slider and the pre-amplifier.  Within the same paragraph, the patent claim states:

> A pre-amplifier is electrically connected to the slider to supply write currents to the write head and receive read back so data from the read head.

> [and]

> A first electrical trace and a second electrical trace to connect the slider to the pre-amplifier may be laminated on top of the insulating layer.

('750 Patent 2:48–50; 2:60–63.)

While the latter language connects the slider to the pre-amplifier rather than the pre-amplifier to the slider, it says that both the first trace and the second trace connect the slider "to" the pre-amplifier.  If connecting the "slider to the pre-amplifier" implies that current flows only in one direction, then both the first *and* second traces are read traces only.  This contradicts the subsequent paragraph, which states that the invention includes both read and write traces, implying that the first and second traces are the read and write traces.[15] (*See* '750 Patent 3:1–3; Figure 3.)  As such, Suncall's construction would imply that there is no write trace linking the pre-amplifier to the slider.  This interpretation would both

---

[15] While the second trace has third and fourth trace parts further towards the distal end of the trace array (*See* '750 Patent 5: 45–54), there is no discrete third (or fourth) trace.

contradict the language of the specification and be nonsensical, as without both read and write traces, the product does not work.

Suncall's comparison to *Bell Atl. Network Servs., Inc. v. Covad Commc'ns. Grp., Inc.*, 262 F. 3d 1258, 1275 (Fed. Cir. 2001) is inapposite. There, the court held that "[t]he use of the word 'or' demonstrates that each transceiver either transmits or receives on a single channel, but not both simultaneously. Nowhere did the *Bell Atl.* court imply that the first channel necessarily transmitted in one direction and the second channel necessarily transmitted in the other, but rather that each channel could only flow in one direction. Similarly here, whether a trace can act simultaneously as a read and write trace is not at issue, only whether the "first trace" is necessarily a read trace.

Finally, the specification also does not support Suncall's construction. As an initial matter, importing limitations from the specifications to the terms of a claim—what Suncall suggests here—is improper. Leaving that aside, the specification includes at least one embodiment—in Figure 8 (depicted below)—of the '750 Patent where both read and write traces have crossover points.

*Illustration 14* ('750 Patent at 10, Fig. 8.)

A lack of crossover points for read traces cannot be used to structurally differentiate the first and second traces when a disclosed embodiment has both read and write traces with crossover points. A construction that excludes a preferred embodiment is "rarely, if ever, correct[.]" *Vitronics Corp.*, 90 F.3d at 1583 (Fed. Cir. 1996).

Suncall's proposed construction contradicts the patent claim and specification. As such, the Court construes "first trace" by its plain and ordinary meaning.

### b. Non-Continuous

Suncall argues that the phrase "non-continuous" should be construed as meaning "not having an uninterrupted physical path," because the '750 Patent's specification, all disclosed embodiments, and the claim language describe a first trace with a non-continuous path with electrical connections provided by other components such as a conductive island. (Suncall Br. at 8–11.) Suncall also argues that the file history supports its construction, as HTI's description of the prior art differentiated the prior art as "continuous and uninterrupted." (*Id.*)

HTI argues that the disclosed embodiments include instances with a continuous physical path, with Suncall mistaking a change in material constituting the path—trace to conductive island back to trace—with no physical path on which electrical signals can flow. (HTI Br. at 33–34.) Moreover, the phrase "physical path" is nowhere in the specification or claim language. (*Id.*)

Suncall's construction is unavailing. While Suncall suggests that a physical path is "interrupted" because the physical medium making up the path changes materials or structure, the definition itself does not say so. Moreover, nothing in the file history or

specification discusses a "physical path," or provides that a change in medium constitutes an interruption in the physical path.  As the patent concerns the flow of electrical signals rather than the contiguous and uniform nature of the material structure, the Court will not read this limitation into the claim with such a limited basis.  As discussed *supra*, where alleged disavowal of claim scope is ambiguous, there is no disclaimer.  *See Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016).  The '750 Patent's specification and prosecution history are at best ambiguous on this point.

Suncall's proposed construction has no basis in the patent specification or file history.  As such, the Court construes "non-continuous" by its plain and ordinary meaning.

### 2.  "plurality of traces . . . in an array" / "plurality of coplanar traces . . . in an array"

| HTI's Proposed Construction | Suncall's Proposed Construction | Court's Construction |
|---|---|---|
| No construction necessary/plain and ordinary meaning | All traces of the flexure that overlap a window, where those traces overlapping the same window are grouped in an array | No construction necessary/plain and ordinary meaning. |

Suncall argues that the phrase "plurality of traces . . . in an array" require that all traces in the array, rather than just a subgroup of traces, satisfy the other remaining claim limitations.  Otherwise, it argues that the invention claimed by the patent will not function and its purpose—balancing the capacitive coupling of the traces to ensure that signals do not interfere with one another—is defeated.  (Suncall Br. at 25–27.)

HTI argues that the relevant dispute is not whether all traces must satisfy the other claim limitations, but rather whether the recited traces must always be all of the traces that

overlap a window or extend along a void, or whether they can be a subset of those traces. HTI argues that the generally accepted meaning of plurality—"two or more"—is not expressly disavowed by the patent claim or file history, and that to the extent the term "plurality of traces" may not be clear, other limitations on the scope of the patent are covered in other terms and do not need to be rolled into "plurality."  (HTI Br. at 54–56.)

Suncall's proposed construction is unavailing.  As discussed *supra*, the ordinary and customary meaning of a term should only be disregarded when the patentee either acts as a lexicographer and clearly defines a term, or clearly disavows the full scope of a claim term in the specification or prosecution history.  *See Thorner*, 669 F.3d at 1365; *CCS Fitness, Inc.*, 288 F.3d at 1366.  HTI neither acted as a lexicographer and clearly defined "plurality" to mean something other than its ordinary meaning, nor clearly disavowed its full scope.

While the '173 Patent's specification consistently states that the "plurality of traces can comprise a pair of outer traces respectively located on lateral ends of the array and at least one inner trace between the pair of outer traces[,]" ('173 Patent 4:50–53), this is not a clear disavowal of the ordinary meaning of "plurality."  As stated, the plurality *can* comprise of this orientation of traces, not that it *must* comprise such an orientation. Moreover, as the '173 Patent specification describes, "[w]hile Figures 5–6 show four traces in the trace array, other numbers of traces are possible, such as three, five, six, or eight, among other options."  ('173 Patent 7:16–18) (cleaned up).  There is no disclaimer of the possibility of an array of traces with two traces only.

To the extent that this description of the array of traces—a pair of outer traces and at least one inner trace—is treated as a disavowal of scope or a new definition of plurality, it still does not support Suncall's proposed construction. Rather, the logical construction would be that plurality means "at least *three*," with two outer traces and one inner trace. There is no language cited by Suncall in the patent specification nor prosecution history that suggests that, in the context of the '173 Patent, "plurality" was intended to mean "all."

Suncall's argument that the purpose of the invention would be defeated unless "plurality" is construed to mean "all" is also unavailing, particularly in the absence of expert testimony from Suncall's expert on the matter. As HTI notes, Suncall misstates the purpose of the '173 Patent by assuming that the patent's goal of achieving "synchronous signal transmission along traces" means that all traces must be synchronized. (HTI Br. at 56 (citing '173 Patent 3:23–25).) As the '173 Patent provides, the problem the patent seeks to solve is asynchronous transmissions which "frustrate operations that depend on synchronous signal transmission between different traces." ('713 Patent 3:5–6.) There is no evidence that all traces in an array must always produce synchronous transmissions in order to resolve this issue, as some operations may not depend on synchronous signal transmission.

Moreover, even assuming that all operations require synchronous signal transmission, as the '173 Patent discusses, the patent's means of ensuring synchronous electrical signals—balancing the capacitance of inner and outer traces—is not the only technological means of reducing the problem of asynchronous signals. As the '173 Patent's background section explains:

The rate of signal propagation in the inner traces can be increased by lowering the inductance of the inner traces. Specifically, the inductance of the inner traces can be lowered by increasing the widths of the inner traces relative to the outer traces. The inner traces can accordingly be made substantially wider than the outer trace, as shown in [Figures] 3–4. The inner traces are commonly 3–4 times wider than the outer traces. Such difference in width between the inner traces and the outer trace evens the rate of signal propagation in the traces of the array such that simultaneously sent signals are simultaneously received.

The consequence of increasing the widths of the inner traces is that the footprint of the trace array is enlarged, which takes up precious space on the flexure, causes the flexure to be large and crowd other components, and increases material costs. Various embodiments of the present disclosure concern techniques for addressing asynchronous signal transmission along traces.

('173 Patent 3:6–25) (cleaned up).

It is plausible that only a plurality of traces in an array may use the technological approach proposed by the '173 Patent to address the issue of asynchronous signal transmission.  Accordingly, Suncall's claim, that "read[ing] these claims only on a subgroup of the traces in the window, and not all traces within the window[,] would defeat the entire purpose of the '173 patent," is not correct and not grounds to construct "plurality" against its ordinary meaning to mean "all."

As such, the Court construes "plurality of traces in an array" by its ordinary and customary meaning.

### 3. "[T]he pair of outer traces are respectively spaced a second distance from the first and second lateral edges"

| HTI's Proposed Construction | Suncall's Proposed Construction | Court's Construction |
|---|---|---|
| No construction necessary/plain and ordinary meaning | the pair of outer traces overlapping a window are spaced less than 50 micrometers from the first and second lateral edges | No construction necessary/plain and ordinary meaning |

Suncall argues that the '173 Patent's innovation requires constructing "respectively spaced a second distance" as less than 50 micrometers, because any distance greater than 50 micrometers will not solve the problem of asynchronous transmission of simultaneously sent signals caused by differing capacitance.  (Suncall Br. at 27–30.)  Suncall points to language in the '173 Patent, which provides that "[o]uter traces would commonly be separated from the first and second lateral side by 50 micrometers, respectively, to prevent electromagnetic interaction between the pair of outer traces and the first and second lateral sides, respectively," in order to resolve the signal delay, as evidence that 50 micrometers is a ceiling on the distance between the outer traces and lateral edges.  (*Id.* at 28 (citing '173 Patent 2:41–47) (cleaned up)).  Otherwise, unless the distance is less than 50 micrometers, the outer traces will not be able to capacitively couple to the lateral edges. (*Id.* at 29–30.)

HTI argues that no special construction is necessary, as none of the words in the term are technical other than "traces," which is undefined.  (HTI Br. at 56–58.)  Moreover, HTI argues that claim 1 of the '173 Patent does not require capacitive coupling at all: only claim 3 expressly requires capacitive coupling, which supports an inference that claim 1

does not require it.  (*Id.*)  Further, even if capacitive coupling is desired, there is no numeric limit on the distance in the patent claim or specification, and the stated 50-micrometer threshold for the particular model of traces discussed in the specification should not be imported as a universal constant when the thickness, material, or other characteristics of the traces or configuration can change and affect the maximum distance under which capacitive coupling can occur between the outer traces and lateral edges.  (*Id.*)

As the Federal Circuit has held, "the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim."  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) (holding that where a "comparison of the independent and dependent claims show[ed] that the dependent claims differ from the independent claims only with regard to the presence of a pressure jacket in the dependent claims[,]" the independent claims had no requirement for a pressure jacket).  Given this rule, Suncall's construction is unavailing. Claims 1 and 3 of the '173 Patent read as follow:

> 1. A flexure comprising: a base metal layer, the base metal layer having a window between a first lateral side of the base metal layer and a second lateral side of the base metal layer, the window defined by a first inner edge of the first lateral side and a second inner edge of the second lateral side; a dielectric material layer having a first side and a second side opposite the first side, the first side of the dielectric material layer disposed against the base metal layer; and a plurality of traces extending along the second side of the dielectric material layer in an array, each trace of the plurality of traces overlapping the window, the plurality of traces comprising a pair of outer traces respectively located on lateral ends of the array and at least one inner trace between the pair of outer traces, wherein all adjacent traces of the plurality of traces are spaced a first distance from each other, the pair of outer traces are respectively spaced a second distance from the first and second lateral edges, and the first distance is greater than or equal to the second distance.

…
3. The flexure of claim 1, wherein the array is configured such that, when the plurality of traces conduct current, adjacent traces of the plurality of traces capacitively couple to each other and the pair of outer traces capacitively couple to each other through the first and second lateral sides.

('173 Patent 10:11–30; 10:33–37) (emphasis added).

Claim 1, an independent claim, does not mention capacitive coupling. Claim 3, a dependent claim of claim 1, expressly differs from claim 1 only in that the flexure is configured to provide capacitive coupling between the adjacent traces of the plurality of traces and each other, as well as the outer traces with each other through the lateral sides of the flexure. This falls squarely within the rule set out in *Liebel-Flarsheim Co*. While Suncall argues that "that capacitively coupling point does not negate the claim's impossibility at more than 50 micrometers[,]" (Suncall Reply Br. at 12), this argument does not address the applicability of the Federal Circuit's rule. Moreover, Suncall admits that "the specification discloses an embodiment where traces do not capacitively couple." (Suncall Br. at 31.) As the Federal Circuit has held, claim interpretation that excludes a preferred embodiment is "rarely, if ever, correct[.]" *Vitronics Corp.*, 90 F.3d at 1583 (Fed. Cir. 1996). It is not correct here.

Assuming without deciding that capacitive coupling is required by claim 1, Suncall's construction is still unavailing. The 50-micrometer distance provided in the patent specification is necessary for a particular configuration of the thickness of the trace and the specific conductive material used. The patent specification provides, concerning thickness, that:

> The thickness of each trace can be between 5–20 micrometers, or more specifically between 10–12 micrometers, for example. The traces are separated from each other by trace separation distances [].The trace separation distances can be equal to each other, such that the traces are evenly spaced from each other along the width of the trace array. The trace separation distances can be between 5–50 micrometers, or more specifically between 15–20 micrometers, for example.

('173 Patent 7:38–47). Similarly, the patent specification provides, concerning materials, that "[t]he traces can be formed from copper, however other conductive metals or other conductive materials can additionally or alternatively be used." (*Id.* 1:66–2:1.) While the patent specification provides a range of possible thicknesses and related distances, the full range of possible materials used in creating the traces—and effects on capacitive coupling—are not discussed by the specification. Thus, there is significant variability within the patent specification itself, and reading even these limitations based on a single embodiment of the patent into the patent claim would be a "cardinal sin." *Phillips*, 415 F.3d at 1319–20.

The patent claim does not require capacitive coupling, and even if it did, there is no textual basis to construe "respectively spaced a second distance" as requiring a distance of less than 50 micrometers. As such, the Court construes "the pair of outer traces are respectively spaced a second distance from the first and second lateral edges" with its ordinary and customary meaning.

### 4. "capacitively couple"

| HTI's Proposed Construction | Suncall's Proposed Construction | Court's Construction |
|---|---|---|
| No construction necessary/plain and ordinary meaning | Indefinite | No construction necessary/plain and ordinary meaning |

Suncall argues that the term "capacitively couple" as used in the '173 and '042 Patents is indefinite because it is not qualified as a relative phenomenon with a degree of quantifiable measurement, but rather a binary—capacitively coupled or not—when "current passing through the traces creates some degree of capacitive coupling" and "[a]ccording to the fundamental physics law for capacitively coupling . . . there is no distance 'far enough away' such that capacitively coupling would not exist to some degree." (Suncall Br. at 31.) Suncall argues that some quantifiable degree of capacitive coupling is necessary for a POSITA to determine whether traces conducting signals are "capacitively coupled," and that this is supported by the prosecution history, wherein the '042 Patent was initially rejected as indefinite. (*Id*. at 31–32.)

HTI argues that no special construction is necessary, as "capacitive coupling" is a well-understood electrical principle. (HTI Br. at 58–60.) Moreover, the '173 and '042 Patents provide an objective and quantified boundary (5–50 micrometers) for at least the arrangement of traces with the materials used in the '173 Patent specification. (*Id.*) HTI finally argues that the patent examiner allowed the '042 Patent to issue after specifically challenging the patent on the issue of definiteness and HTI revising the patent, and that Suncall's contention that the patent is indefinite is weak because it is unsupported by expert testimony. (*Id.*)

As discussed *supra*, when a word of degree is used, the district court must determine whether the patent's specification provides some standard for measuring that degree, *Seattle Box Co.*, 731 F.2d at 826, and that standard must provide "objective boundaries for those of skill in the art" to measure that degree when "read in light of the specification and

the prosecution history[.]"  *Interval Licensing LLC*, 766 F.3d at 1370–71.  However, "[i]ndefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co.*, 844 F.3d at 1377.

Suncall's argument is unavailing.  As HTI argues, the specification provides an objective boundary for the embodiment disclosed in Figure 6 of the specification: for traces made of copper with a thickness of between 5–20 micrometers, the trace separation distance which allows for "capacitive coupling" under the standards of the patent can be no greater than 50 micrometers.  (*See* '173 Patent 7:38–47).  Unlike the '945 Patent's use of terms of degree discussed *supra*, there is a clear quantifiable objective boundary calculable by a POSITA: the minimum electrical exchange necessary to meet the requirements of the disclosed embodiment in Figure 6.  Similarly, unlike in *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1338 (Fed. Cir. 2015), where the patentee presented multiple definitions of "molecular weight" in the claim and switched between them during prosecution, the '173 and '042 Patents provided only one basis for measuring capacitance.

The prosecution history also does not support Suncall's argument for indefiniteness. On the record before the Court, the patentee filed a preliminary amendment prior to examination on February 5, 2015, canceling patent claim 1 and adding language for patent claims 2 through 21.  (*See* Suncall Index Ex. 24.)  On August 19, 2015, the PTO examiner responded, raising objections to the patent claim in part based on the examiner's assertion that the claim terms "small enough" and "capacitively couple" rendered the claim vague and indefinite.  (Suncall Index Ex. 23 at 2.)  The PTO examiner argued that because there

66

is no theoretical distance "that would diminish the capacitance of two such adjacent and unshielded conductors to zero[,]" the claim needed to define what amount of capacitance is required to be considered "capacitively coupled within the claim scope," which the claim had not done. (*Id*. at 4–6.) The patentee then filed another submission on December 21, 2015. (Buergi Decl., Ex. S at 2.) The PTO examiner responded with further objections to the claim on January 8, 2016, but these objections did not include any further objection or question as to definiteness. (*Id*. at 1–5.) On April 28, 2016, the PTO issued a Notice of Allowability for the patent. (Buergi Decl., Ex. T.)

While the patent examiner's initial question concerning capacitance was not resolved within the record before the Court, this is not sufficient grounds to find indefiniteness. "Following examination by the [PTO], a duly issued patent is presumed valid, as is a duly reissued patent. The burden of proving otherwise resides with the person challenging its validity." *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1139 (Fed. Cir. 1985). As discussed *supra*, for statements made during prosecution to disavow claim scope, the statements must be "both clear and unmistakable," *Avid Tech., Inc.*, 812 F.3d at 1045. Where a PTO examiner abandons a challenge to claim language, if the "record finally reflects the examiner's acquiescence to the claim language chosen by the applicant[,]" the initial challenge is not clear evidence of the patentee's "disavowal of claim scope" even if the PTO examiner's abandonment of the argument is unexplained or goes unanswered in the record. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1124 (Fed. Cir. 2004).

Here, the PTO examiner's abandonment of the issue of whether "capacitively couple" is fatally indefinite prevents the prosecution history from providing support for Suncall's position.  Nor does Suncall provide any supporting expert opinion as to the indefiniteness of this term. Accordingly, as the '173 and '042 Patents' specification provides an objective boundary for the phrase "capacitively couple," which is undisturbed by the prosecution history, the Court construes "capacitively couple" with its ordinary and customary meaning.

### E.  Claim Construction For The Actuator Patents

The parties dispute the meaning of four terms from the Actuator Patents.  Suncall argues that: (1) the term "conductive polymer extending between a first and generally horizontal surface of the microactuator and a grounded flat surface on at least one of said portions" should be construed as "conductive polymer extending between a first and generally coplanar top and generally horizontal surface of the microactuator and a grounded flat surface of the proximal or distal portion of the suspension[;]" (2) the term "separated by a horizontal gap" should be construed as "separated by a gap defined by the adjacent top surfaces of the base plate and microactuator in the horizontal direction[;]" (3) the term "through hole in the flexure" should be construed as "a hole that passes completely through the flexure[;]" and (4) the term "the flexure having a stainless steel base layer, a trace layer, a through hole, and a plated contact" should either be treated as indefinite or construed as "the flexure includes a stainless steel base layer, a trace layer, a through hole and a plated contact, thus the through hole must go through all components of the flexure, including the stainless steel base layer, the trace layer, and the plated contact."  (Suncall

Br. at 11–17; 33–38.)  HTI argues that none of the terms requires a special construction, but rather each should be given its plain and ordinary meaning.  (HTI Br. 34–42; 61–66.)

> 1.  "[C]onductive polymer extending between a first and generally horizontal surface of the microactuator and a grounded flat surface on at least one of said portions"

| HTI's Proposed Construction | Suncall's Proposed Construction | Court's Construction |
|---|---|---|
| No construction necessary/plain and ordinary meaning. | Conductive polymer extending between a first and generally coplanar top and generally horizontal surface of the microactuator and a rounded flat surface of the proximal or distal portion of the suspension | No construction necessary/plain and ordinary meaning. |

Suncall argues that its construction must be adopted by the Court because the plain and ordinary meaning "does not capture the claim scope disavowals from the file history and descriptions in the specification."  (Suncall Br. at 11.)  The claim scope is allegedly limited in the specification because the specification describes generally coplanar top surfaces of the microactuator and suspension, and that the conductive adhesive is only on the top of those surfaces.  (*Id.* at 11–15.)  The claim scope is allegedly limited in the prosecution history by the patentee disavowing the placement of conductive adhesive on the bottom as prior art from the Nakagawa Patent.[16]

HTI argues that no construction is required because to the extent that the claim term contains any technical terms, such as "microactuator," Suncall does not attempt to define

---

[16] While neither party cites to the specific patent referenced as the "Nakagawa Patent," the relevant patent is recorded as US 6,791,783.  (See Suncall Index Ex. 21 at 6.)

them.  (HTI Br. at 34.)  Additionally, it argues that Suncall's proposed construction: (1) violates the plain meaning of the term (which includes non-coplanar surfaces and both the generally horizontal top and bottom of the microactuator); (2) violates the doctrine of claim differentiation; (3) excludes a disclosed embodiment; and (4) improperly rewrites the claim.  HTI also argues that Suncall mischaracterizes the prosecution history, which does not clearly disavow claim scope mandating Suncall's construction.  (*Id.* at 35–39.)

In reviewing the intrinsic record to construe a patent's claims, the Court "strive[s] to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention."  *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011).  However, if the asserted claims lack language limiting the patent to the disclosed specifications, it is improper to limit the claim scope in this way, and importing limitations into the patent's terms from the specification is improper.  *Id.* at 1304.  Likewise, other claims of the patent in question can be "valuable sources of enlightenment as to the meaning of a claim term," and "the usage of a term in one claim can often illuminate the meaning of the same term in other claims."  *Id.* at 1314 (citing *Vitronics*, 90 F.3d at 1582).  Similarly, as discussed *supra*, statements in a prosecution history must be "both clear and unmistakable" to disavow a claim's scope, and "[w]here the alleged disavowal is ambiguous, or even 'amenable to multiple reasonable interpretations,'" there is no disclaimer.  *Avid Tech., Inc.*, 812 F.3d at 1045; *see also Retractable Techs., Inc.*, 653 F.3d at 1304 ("Ultimately, the inventor's statement, on its

own, lacks the clarity required to exclude from the scope of the claims a needle holder and a retainer member that form distinct portions of a single structure.")

Suncall's construction is unavailing. The language of the '082 Patent claim and specification do not mandate Suncall's construction, as nowhere do they make clear that the patent should be limited solely to the disclosed embodiments. The specification expressly states that the invention is not limited to PZT microactuators or to designs "where the microactuator is located within a structure integral to the baseplate" as described by the preferred embodiments. ('082 Patent 3:54–4:6.)

The phrases from the specification cited by Suncall in support of its position explicitly do not limit the patent claim to the disclosed embodiments. As stated by the patent specification:

> According to one embodiment of the invention . . . [t]he ground connection is made by a dispensation or mass of electrically conductive adhesive that bridges a first gap between the top and generally horizontal face of the PZT device and an electrical ground top portion of the suspension that is adjacent to and generally coplanar with the PZT, or at least close to the PZT, such that the conductive adhesive touches both the negative electrode of the PZT and a ground portion of the suspension such as the stainless steel body of either the base plate or some other portion of the suspension that is adjacent or at least close to the PZT.

('082 Patent 2:20–37) (emphasis added).

Similarly, the phrase describing how "[conductive adhesive] is dispensed such that it lies partly on [the] top face of the distal portion of the suspension, and partly on [the] top face of the PZT, and bridges the gap there between" (*id.* 4:54–56), refers to the structure of the "first embodiment of the invention" (*id.* 4:8) rather than all of it. Finally, the phrase stating that "preferably the horizontal top face of PZT is coplanar, or nearly coplanar, with

71

adjacent horizontal top faces and of the suspension" (*id*. 5:54–56) expressly provides that this is *preferable*, meaning that the top face of the PZT does not have to be either coplanar or nearly coplanar. Moreover, as the specification expressly names that a PZT microactuator is not required ('082 Patent 3:54–4:6), the limitations expressed by the embodiments as optional are necessarily also limited to embodiments of the patent that use a PZT.

Suncall's construction also ignores claim differentiation within the '082 Patent. Suncall argues that "first and generally horizontal surface" should be characterized to include an implicit limitation that the conductive polymer extends between generally coplanar surfaces, but claim 8 of the patent recites a dependent claim for the suspension of claim 1 "wherein a top surface of the microactuator is generally coplanar with an adjacent top surface of the suspension." ('082 Patent 8:10–12.) While not a dependent claim of claim 11, claim terms are normally used consistently through the patent, and usage in one claim can illuminate the meaning of the same term in other claims. *See Phillips*, 415 F.3d at 1314. Moreover, in its discussion of the prosecution history, Suncall treats discussion differentiating claim 1 from prior art as relevant for interpreting claim 11. (Suncall Br. 14–15.) As the limitation of the dependent claim in claim 8 is presumed not to necessarily apply to the independent claim in claim 1, and the patent has clearly differentiated between "horizontal" and "coplanar," there is no reason to imply that claim 11 requires the conductive polymer to extend between generally coplanar surfaces.

The prosecution history is also insufficient to meet the demanding standard to disavow claim scope necessary for Suncall's construction to be granted. The relevant

portion of the prosecution history, in which the patentee differentiates the '082 Patent from

the Nakagawa Patent, states that:

> As amended, [claim 1] does not read on Nakagawa's cited Figures 3 or 4 in which the microactuators as mounted on the suspension have much different structures. Nakagawa does not have a horizontal gap that separates the horizontal surface of the microactuator from an adjacent horizontal surface of the suspension as claimed. Nakagawa does not have nonconductive adhesive directly overlaying conductive adhesive as claimed. Nakagawa's nonconductive adhesive is not separated from any horizontal gap by conductive adhesive as claimed. Nor would such a modification be obvious because Nakagawa provides no reason or motivation for rearranging his structure, and no indication that there is anything inadequate with his structure.
> …
> Claim 12 has been amended to recite that a horizontal gap separates "the generally horizontal surface of the microactuator and the grounded flat surface of the suspension" and that the non-conductive polymer "extend[s] across the gap and onto and over the grounded flat surface of the suspension and [is] bonded directly to said grounded flat surface of the suspension." For reasons similar to those discussed above with respect to claim 1 as amended, claim 12 as amended recites a structure that is neither disclosed nor suggested by either Nakagawa or Hanya.

(Suncall Index Ex. 21 at 7–8.)

While Suncall claims that these statements provide that the "[a]pplicant disavowed

the conductive adhesive on the bottom of the microactuator like Nakagawa[, which] must

be on the top horizontal surface[,]" and the "adjacent horizontal surface of the suspension

as claimed cannot be like Nakagawa, which supports that the claimed surfaces are generally

coplanar as disclosed in the specification[,]" (Suncall Br. 14–15), such limitations are far

from "clear and unmistakable."  The fact that the Nakagawa Patent does not have a

horizontal gap does not exclude an embodiment of the '082 Patent from having both a

horizontal and vertical gap, thus being non-coplanar.   Similarly, the extension of the

polymer "across the gap and onto and over the grounded flat surface of the suspension" could readily refer to extension across a gap and over and onto the bottom flat surface, not the top. Even if the prosecution history could be read to support Suncall's construction, it does not do so in a clear and unmistakable way, and as such does not override the better reading of the patent claim and specification. *See Retractable Techs., Inc.*, 653 F.3d at 1304 (holding that even where the inventor's statement during prosecution could imply that a needle holder and retainer member must be separate pieces attached together, "the inventor's statement, on its own, lacks the clarity required to exclude from the scope of the claims a needle holder and a retainer member that form distinct portions of a single structure.")

As such, the Court construes "conductive polymer extending between a first and generally horizontal surface of the microactuator and a grounded flat surface on at least one of said portions" with its ordinary and customary meaning.[17]

### 2.    "[S]eparated by a horizontal gap"

| HTI's Proposed Construction | Suncall's Proposed Construction | Court's Construction |
|---|---|---|
| No construction necessary/plain and ordinary meaning | Separated by a gap defined by the adjacent top surfaces of the base plate and microactuator in the horizontal direction | No construction necessary/plain and ordinary meaning |

---

[17] HTI argues that "[d]eleting "on at least one" [from the claim] improperly rewrites the limitation to require the "grounded flat surface" to be solely on "the proximal or distal portion" rather than being on "at least" one of those portions and potentially extending beyond that portion." (HTI Br. at 37.) Suncall argues that it only replaced "said portion" for clarity and not for a more substantive reason. (Suncall Br. at 11 n.3.) As such, the Court rejects Suncall's construction.

Suncall argues that its construction—"separated by a gap defined by the adjacent top surfaces of the base plate and microactuator in the horizontal direction"—must be used because, as discussed *supra*, the prosecution history indicates that HTI disclaimed a broader claim scope by contrasting the '082 Patent with the prior art Nakagawa Patent. (Suncall Br. at 15–17.)  Moreover, the specification makes clear that the horizontal gap must be between adjacent top surfaces.  (*Id.*)  Suncall relies on the same evidence discussed in the preceding section, *supra*.

HTI argues that the term "separated by a horizontal gap" should be defined by its ordinary and customary meaning, as it is a readily understandable, non-technical term and the claim recites the two things being separated by the horizontal gap: "the first surface of the microactuator" and "the grounded flat surface of the suspension."  (HTI Br. at 40 (citing '082 Patent 8:29–31).)  Additionally, HTI argues that Suncall's construction redrafts the claim to import limitations from the specification, conflicts with claim 1 (which uses the word "adjacent"), and excludes possible embodiments where the gap is between the microactuator and something other than the base plate.  (HTI Br. at 40–42.)

Suncall's construction is unavailing.  As discussed *supra*, the prosecution history does not provide a clear and unmistakable disavowal of patent scope, and it would be improper to import limitations from the patent specification into the claims.  As such, limiting the construction only to the "adjacent top surfaces of the base plate" would be inappropriate.

Moreover, HTI properly identifies other issues with Suncall's proposed construction.  Claim 1 describes a "conductive adhesive extending over and bridging a

horizontal gap that horizontally separates a horizontal surface of the microactuator from an adjacent horizontal surface of the suspension," while claim 11 does not use the word "adjacent" to describe the placement of any adhesive.  ('082 Patent at 7:39–46; 8:19–36.) Where a proposed construction would introduce "avoidable redundancy into the language of the claims[,]" an alternate construction that "gives meaning to all the terms of the claim" is preferred.  *See HBAC Matchmaker Media, Inc. v. Google Inc.*, 650 F. App'x 990, 992–93 (Fed. Cir. 2016) (reversing the district court's construction of a claim to limit the term "head end system" to require a TV system, when two other independent claims within the same patent specifically included a TV limitation).   As such, no adjacency requirement can be read into claim 11.  Further, Suncall's definition excludes possible embodiments between the microactuator and "either the base plate or some other portion of the suspension that is adjacent or at least close to the PZT."  ('082 Patent at 2:35–37.)  This expressly contradicts both a construction that the gap be between the microactuator and base plate and that the base plate (or alternative portion of the suspension) be adjacent to the PZT.

As such, the Court construes "separated by a horizontal gap"" with its ordinary and customary meaning.

### 3.  "[T]hrough hole in the flexure"

| HTI's Proposed Construction | Suncall's Proposed Construction | Court's Construction |
|---|---|---|
| No construction necessary/plain and ordinary meaning | A hole that passes completely through the flexure | No construction necessary/plain and ordinary meaning |

Suncall argues that "through hole in the flexure" should be defined as (1) a hole that passes completely through the flexure; and (2) that the through hole passes completely through the flexure rather than through a portion of it.  (Suncall Br. at 33–36.)  Suncall argues that the specification and file history both show a distinction between a "through hole" in the flexure and through other components, and that the flexure is clearly defined to include all of its layers, even if a hole through all of its layers would render the invention non-functional.  (*Id*.)

HTI argues that "through hole" does not need to be specially construed as "through" and "hole" are non-technical terms and Suncall does not attempt to define the technical word "flexure."  (HTI Br. at 61.)  HTI also argues that Suncall's construction contradicts the claim language and specification, as the specification language implies that the through hole does not pass through all layers, and at least one disclosed embodiment has a through hole that does not pass through the traces.  (*Id*. at 61–65.)

If a claim is susceptible to only one reasonable interpretation, even if that interpretation results in a nonsensical construction of the claim as a whole, the court must abide by this interpretation as it "may not redraft claims, whether to make them operable or to sustain their validity."  *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (citing *Process Control Corp. v. Hydreclaim Corp.*, 190 F.3d 1350, 1357

(Fed.Cir.1999)).  However, when a "claim term is susceptible to more than one reasonable interpretation, and because claims should be construed, if possible, to sustain their validity," the court should "interpret the term to give proper meaning to the claim in light of the language and intrinsic evidence and should interpret the term as the patentees intended, even if such interpretation disavows the "most common dictionary meaning." *EveryScape, Inc. v. Adobe Systems, Inc.*, 8 F.Supp.3d 38, 50 (D. Mass. 2014) (citing *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1363 (Fed. Cir. 2008)).

Suncall's construction is unavailing.  The relevant portion of the patent claim reads as follows:

> [Claim 1:] A dual stage actuation suspension, including[] a flexure, the flexure **having a stainless steel base layer, a trace layer, a through hole, and a plated contact**, the plated contact comprising a non-corrosive metal or metal alloy plated on the trace layer, the plated contact **exposed through the through hole in the flexure**; a motor having an electrical contact; and a conductive adhesive joint extending from the electrical contact to the plated contact to electrically connect the electrical contact with the trace layer.

> [Claim 2:] The suspension of claim 1, **wherein the through hole extends through the stainless steel base layer.**

> [Claim 3:] The suspension of claim 2, wherein the conductive adhesive extends though the through hole to connect to the plated contact.

('555 Patent 6:7–22) (emphasis added).

First, Claim 2 describes a variation on Claim 1 where the through hole extends through the stainless steel base layer.  As a dependent claim adding a particular limitation to the independent first claim, Claim 2 gives rise to a presumption that its limitation—a through hole extending through the stainless steel base layer of the flexure—is not present

in Claim 1.  *See Phillips*, 415 F.3d at 1314.  This presumption contradicts Suncall's proposed construction that a through hole must go through all layers of the flexure.

Second, the embodiment disclosed in Figure 3 of the '555 Patent (Illustration 15 below) is inconsistent with Suncall's construction.  Figure 3 shows component 131', a through hole, in the flexure's stainless steel base layer that "expose[s] a plated portion of a trace on the flexure[.]"  ('555 Patent 4:17–21.)

*Illustration 15* ('555 Patent at 4, Fig. 3)



The through hole allows the passage of matter through the flexure but does not cut through the trace layer of the flexure, which has gaps.  Conductive adhesive (component 136') goes through the through hole and touches the plated motor contact (component 134').  As with the dependent claim 2, the patent specification discloses an embodiment with a through hole that does not go through all layers of the flexure.  As discussed *supra*, a claim construction that excludes a disclosed and preferred embodiment is "rarely, if ever, correct[.]"  *Vitronics Corp.*, 90 F.3d at 1583 (Fed. Cir. 1996).

The prosecution history raised by Suncall is also unavailing, as it does not concern the actual patent at issue. As such, the patent file history for Patent No. 8,885,299 has limited interpretive value. To the extent this file history provides guidance, it does not overcome the intrinsic evidence provided by the patent claim, specification, and disclosed embodiments. That intrinsic evidence favors a finding that a "through hole in the flexure" does not necessarily have to go through every layer of the flexure. As such, the Court construes the term "through hole in the flexure" with its ordinary and customary meaning.

**4. "[T]he flexure having a stainless steel base layer, a trace layer, a through hole, and a plated contact"**

| HTI's Proposed Construction | Suncall's Proposed Construction | Court's Construction |
| --- | --- | --- |
| No construction necessary/plain and ordinary meaning | Indefinite <u>OR</u> the flexure includes a stainless-steel base layer, a trace layer, a through hole and a plated contact, thus the through hole must go through all components of the flexure, including the stainless-steel base layer, the trace layer, and the plated contact | No construction necessary/plain and ordinary meaning |

Suncall argues that either the disputed term means that the through hole must go through all components of the flexure, including the stainless-steel base layer, the trace layer, and the plated contact, or that the term is indefinite. Suncall essentially repeats its prior arguments, discussed *supra*, but also argues claim 1 is nonsensical, as the "through hole" is listed as part of the flexure but is not listed for claim 13, and—assuming that a through hole must go through all layers of the flexure—a through hole cannot logically go through itself. (Suncall Br. at 36–37.) Suncall further argues that the disputed term is

indefinite. (*Id.*) Mirroring its prior arguments, discussed *supra*, HTI argues that a through hole does not need to go through all layers of the flexure, and as Suncall's arguments for its construction or indefiniteness are based on this assumption, its arguments are without merit. (HTI Br. at 65–66.) HTI also argues that Suncall's indefiniteness argument lacks explanation or supporting expert testimony. (*Id.*)

Suncall's argument is unavailing. As discussed *supra*, the Court does not find that a "through hole in the flexure" must penetrate through all layers of the flexure to meet the criteria of the patent. As such, there is no need to exclude the trace layer or plated contract from the defined flexure. Similarly, as the through hole is not construed to necessarily go through every layer of the flexure, the fact that the through hole is incorporated into the definition of the flexure in claim 1 does not render the term nonsensical. Rather, this provides further supporting evidence for a construction of "through hole in the flexure" that does not require such a construction, as the Court will "[construe] claims, if possible, to sustain their validity…[and] interpret the term as the patentees intended, even if such interpretation disavows the 'most common dictionary meaning.'" *EveryScape, Inc.*, 8 F.Supp.3d at 50.[18]

As such, the Court construes "the flexure having a stainless-steel base layer, a trace layer, a through hole, and a plated contact" with its ordinary and customary meaning.

---

[18] Suncal also raises an argument that the term is indefinite. This argument is not supported by evidence or case law, and the Court will not consider it further.

## IV.    ORDER

Based upon the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that the disputed claim language is construed as set forth in this Order.


Dated: February 9, 2024                              /s/ Susan Richard Nelson
                                                      SUSAN RICHARD NELSON
                                                      United States District Judge